LAWSON LESTER, JR. v. M. P. McLEAN, JR. AND R. G. BURGE v. M. P. McLEAN, JR.

(Filed 30 June, 1955.)

**1. Fraud § 3—Representation of replacement cost held to relate to matter of opinion and insufficient to support action for fraud.**

On defendant's counterclaim based on fraud inducing the purchase of property, defendant testified that plaintiffs represented that they had an equity in a large sum in the property, and that the cost of the project was in a certain amount, which amount substantiated the representation as to the amount of the equity. The evidence further tended to show that the representations as to cost were based upon a project analysis showing the present replacement value and that they were made in pointing out the figures on the project analysis, to which defendant had access. *Held:* The representations as to the equity were based upon the known amount of the mortgage subtracted from the present replacement cost, which was

necessarily a matter of opinion, and therefore such representations do not constitute a basis for an action for fraud.

**2. Same—**

A representation which is nothing more than a statement of opinion cannot constitute fraud.

**3. Fraud § 5—Evidence held insufficient to show that purchaser was deceived by or relied upon representation.**

On defendant's counterclaim based on fraud inducing the purchase of property, defendant testified that plaintiffs represented that the buildings had been constructed in accordance with plans and specifications approved by the FHA. The evidence further tended to show that defendant had never seen the original plans and specifications of the project, that the original plans had been modified by consent of the parties several times during the progress of the work, and that the FHA had approved the finished buildings for the purpose of guaranteeing a mortgage loan thereon, and further that defendant, his attorney and officers and employees of defendant's company, had unlimited opportunity to inspect the property and did so repeatedly before the purchase, and that defendant made payments on the purchase money notes for fifteen months after he was in possession. *Held:* The evidence is insufficient to show that defendant was deceived by the representations or induced thereby to purchase the property.

**4. Fraud § 10—**

Where defendant sets out fraud as an affirmative defense, the burden of the issue is on defendant.

**5. Fraud § 1—**

To constitute fraud, there must be a false representation, known to be false, or made with reckless indifference as to its truth, and it must be made with the intent to deceive.

**6. Fraud § 11—**

On a counterclaim for fraud inducing the purchase of property by defendant, the contract of sale entered into by the parties is admissible as evidence as to what the parties actually agreed, even though the action is in tort.

APPEAL by defendant from *McSwain, S. J.,* October Term 1954, FORSYTH Superior Court.

The plaintiffs each brought a separate action against the defendant for the recovery of the balance due on a note dated 15 February, 1951, in the sum of $30,555.52, upon which five payments had been made, each for $3,819.44, on 15 May, 15 August, and 15 November, 1951; and 15 February and 15 May, 1952, leaving a balance due of $11,558.32 on each note, with interest at four per cent.

The defendant admitted the execution of the notes, the payments, and the balance due as alleged. As a defense and counterclaim he alleged

the notes were given in part payment for capital stock in Park Terrace, Inc., which he was induced to purchase at the price of $182,500, by the false and fraudulent representations of the plaintiffs. Specifically, he alleged that Park Terrace, Inc., was the owner of a Federal Housing Administration financed project consisting of 355 rental apartments grouped in approximately 90 buildings, intended as low priced, low rental units, for occupancy by colored tenants, built according to the plans and specifications approved by the Federal Housing Administration and financed by a government insured loan on the project for $1,632,000; that the plaintiffs represented they had, in the property, an equity of $187,000, and that the improvements were constructed according to plans and specifications approved by the Federal Housing Administration. The defendant alleged he relied on the representations of the plaintiffs, both as to the equity and as to the construction of the improvements according to the plans and specifications; that these representations were false and fraudulent; that he was induced by them to purchase the stock to his damage in the sum of at least $170,000.

Each plaintiff replied to the counterclaim, denying any false or fraudulent representations, and set up as a bar thereto a contract entered into 15 February, 1951, between the plaintiffs and W. B. Pollard, parties of the first part, and M. P. McLean, Jr., party of the second part, under the terms of which the plaintiffs sold their stock to the defendant for $182,500, and that the defendant at the time of the contract stipulated and agreed that he was taking the property in its then condition and without any guarantee, and agreed that no claim should be made against the parties of the first part or Park Builders, or J. A. Bolich, of any nature whatsoever because of defective workmanship, defective or inferior building materials in the structures, and that the same were accepted unconditionally.

The two cases were consolidated and tried together. Each plaintiff introduced his note, together with the allegations of the complaint with respect to its execution, balance due, and the corresponding admissions in each answer. The plaintiffs introduced the agreement dated 15 February, 1951, and rested.

The defendant testified in his own behalf and offered the testimony of W. B. Pollard, Ed Coble, and others, together with numerous documents, including construction contract, project analysis, inspection reports, and correspondence. This evidence will be referred to in the opinion. At the conclusion of defendant's evidence the plaintiffs moved for judgment of nonsuit as to defendant's counterclaim in each case. The motions were allowed, to which the defendant excepted. Under peremptory instructions the jury answered the issues in each case in

favor of the plaintiff. Judgments were entered accordingly, to which the defendant excepted, and from which he appealed.

*Broaddus, Epperly & Broaddus and Womble, Carlyle, Martin & Sandridge for plaintiffs Lester and Burge in each case, appellees.*

*Spry, White & Hamrick, by W. D. Spry, and Dallace McLennan for defendant, appellant.*

HIGGINS, J. The pleadings and stipulations have settled all matters in dispute in these cases except the defendant's counterclaims. If evidence of fraudulent misrepresentation was sufficient to raise a jury question, then the trial court committed error in granting the motions for judgment of nonsuit on the counterclaims and a new trial should be awarded. On the other hand, if the defendant's proof of fraud was insufficient to go to the jury, then, of course, the trial court was correct and the judgments should stand.

While details are unnecessary, a few of the essential facts constituting the background of the case will help to clarify the issue involved. Prior to August, 1949, the plaintiffs, in collaboration with W. B. Pollard, applied to the Federal Housing Administration for a commitment to insure a loan for the construction of a low cost, low rent housing project in Winston-Salem for colored occupants. Plans were submitted for 355 apartments with streets, drives and parking space. After examining the plans, the Federal Housing Administration indicated a willingness to insure a loan up to 90 per cent of the value of the project. Whereupon the applicants incorporated under the name Park Terrace, Inc., with plaintiffs and W. B. Pollard each subscribing for 100 shares of A stock at $1.00 per share par value. Pollard was elected president and he and the plaintiffs were named directors. The plaintiffs and others, not including Pollard, organized another corporation, Park Builders, Inc. The plaintiffs were elected to its board of directors. Park Terrace entered into a contract with Park Builders under the terms of which the latter was to do the actual construction work on the project. There is evidence the contract price for the structures was $1,527,225.

In addition to the A stock, Park Terrace issued B stock of the par value of $1.00 per share as follows: 41,097 shares to each of the plaintiffs and to W. B. Pollard; and 70,151 shares to Lief Valand. For the B stock the owners agreed to pay to the corporation its par value in cash, or in property, or in services. Lief Valand was the architect who drew the plans and supervised the construction, and apparently received his B stock for his services. The incorporators paid $8,160 insurance premiums; $8,160 inspection fees; $4,896 Federal Housing Administration examination fee; and other expenses incident to the

incorporation. The Federal Housing Administration agreed to guarantee a loan for $1,632,000. The commitment was first made to the First National Bank of Martinsville, Va., and later transferred to the Wachovia Bank & Trust Company, Winston-Salem, N. C. After the construction of the project was completed, Valand offered his B stock for sale, first to the corporation, and, when the offer was refused, later sold it to the plaintiffs for an alleged price of $500. However, all B stock was surrendered to the corporation and canceled before negotiations began for the sale of the A stock to McLean.

Park Builders began constructing the housing units in October, 1949, subcontracting parts of the work. As the work progressed, Valand, the architect, made progress reports and after inspection and approval by the Federal Housing Administration the Wachovia Bank & Trust Company made advances against the amount of the loan. The final advancement was made 23 October, 1950. "Shortly following the final advance of $186,605.09, which was approved by the Federal Housing Administration, and finally approved for insurance on November 3, 1950, . . . said final approval . . . was not given by FHA until the architect in charge of the project . . . had approved said final advancement; nor until Wachovia Bank & Trust Co. had reported to the FHA that the construction was completed; nor until the inspectors of the FHA had inspected and made their final reports."

On 4 December, 1950, Burge, Lester and Pollard sold to J. A. Bolich, Jr., 101 shares of A stock in Park Terrace. Bolich was directed to negotiate a sale of the entire property to the Federal Government as a public housing project. These negotiations were not successful. As an investment the project proved a financial failure. Demand for rental property of this type among colored people did not meet expectations. Only about one-half the apartments were occupied and many of the tenants defaulted in payments of rent.

Such was the situation the latter part of January, 1951. At that time the McLean Trucking Company, of which the defendant was president, was in need of housing facilities for its truck drivers and their families. In order to provide housing for the employees of his company, the defendant planned to develop his own housing project. To use his own words: "I went to see Mr. Bolich about helping with possibly building . . . as a result of that contact I learned about Park Terrace . . . Mr. Bolich said there was a housing project on Walkertown Road that was having a rough time getting along and that might be bought for $125,000 above the mortgage. He told me it was owned by Mr. Burge, Mr. Lester and Mr. Pollard. Mr. Bolich and I rode out to see the project." With this beginning, negotiations continued for two weeks and resulted in a sale and transfer to the defendant of all the outstand-

ing A stock in Park Terrace for the price of $182,500. The purchase price was arranged by part payment in cash and the execution of notes for the remainder.

The gist of defendant's claim is that the plaintiffs induced him to purchase the stock in Park Terrace by false and fraudulent representations in two particulars: First, that they had an equity of approximately $187,000 in the property, whereas the property was not worth the amount of the mortgage; second, that the housing units were constructed in accordance with the plans and specifications approved by the Federal Housing Administration, whereas both the workmanship and materials used were inferior, and not in accordance with the plans and specifications, to his damage in the sum of $170,000.

The plaintiffs, by way of reply, denied all charges of false representation and set up the contract of sale as a bar to recovery on the counterclaims.

So much for the contentions—now the evidence: The representations with respect to the equity in the property according to McLean's testimony were: "In the course of the conversation . . . with Bolich, he showed me what they owed on the project . . . I can't remember the exact figure . . . then he showed me a project analysis. One figure showed $1,900,000, which I supposed to represent the replacement cost of the property. And another figure of one million eight hundred and some thousand dollars, representing the cost of the project." However, when confronted with the project analysis, he said: "This is the document Mr. Bolich showed me. The figures were pointed out to me which is No. 7. Total estimated replacement cost of the property, and is $1,819,908. That was represented to me to be the cost of the project by Mr. Bolich. I am sure Mr. Bolich told me where he got this document . . . he got it from Mr. Burge and Mr. Lester." The defendant introduced the project analysis which showed the $1,819,908 *to be the present replacement value.* "Mr. Bolich said Mr. Burge and Mr. Lester had indicated they would take the difference between the mortgage and the $1,819,000 for their stock. It came to $187,000 and I offered him $175,000 . . . Some two weeks later we had a meeting in Mr. Sandridge's office. That was on February 15, 1951. I do not personally know what the stock was worth when I acquired it. I have no objection to paying for the stock if they will fix the project like they told me it was when I bought it."

The defendant offered as a witness Herman Ward, a certified public accountant, who testified he had examined the books of Park Terrace. "These figures I have here are taken from the books as of February 15, 1951, as they were turned over to us . . . The books showed as to the property that went to make up Park Terrace: Lands and improvements

and buildings and equipment was shown at a total value of $1,722,163. That figure contained a writeup of the assets of $196,641.83, showing a net cost of the property, $1,525,521.17. The mortgage on the property as of February 15, 1951 was $1,632,000. The figure I called out is the cost of land and improvements and buildings and equipment." He further testified an analysis of the books showed the value of the property to be $42,000 less than the mortgage debt. On cross-examination, the witness admitted: "It is frequently the case that there is a vast difference between the book value of a corporation shown on its books and the actual value of the corporation. At times there is no connection between the two, and at times there is . . . The books at the date of February 15, 1951, show a net worth of $154,582.05. That net worth is a matter of 100 shares of preferred stock, $300 of common class A stock, and an appraised surplus of $169,083.83, and an operating deficit of $14,901.78."

"The minutes of the meeting of the board of directors on November 4, 1950, provided that the land, improvements and buildings and equipment be carried on the books at $1,722,163, which does not include $48,000 . . . That represents an outlay by the promoters." The witness testified that including the $48,000 there was a total of prepaid items amounting to $81,114. "There is nothing wrong with including that as an asset." The defendant introduced as his Exhibit 4 the Federal Housing Administration project analysis dated 8-31-49, signed by Guy T. Allen, Deputy for Chief Valuator (probably a private realtor), who certified he had read Sec. 512 (a) of the National Housing Act, and that he had no interest in the project nor in the proceeds of the mortgage. Under the heading, "Estimated Present Replacement Cost of Property," was the following: Improvements to land, $238,198; structures, $1,269,433; fees, $154,532; carrying charges, $93,745; legal and organization, $2,000; fair market value of the land in fee simple, $60,000; total replacement cost of property, $1,819,908. On the basis of this appraisal the directors seem to have been somewhat conservative in setting up the financial structure of Park Terrace under their resolution dated 4 November, 1950. McLean did not become interested in the property until two months later. It is not claimed the books were set up for the purpose of perpetrating a fraud.

The defendant offered the testimony of Mr. Minish and Mr. Kempton, experienced realtors, who gave as their opinion Park Terrace was worth $1,200,000 on 15 February, 1951.

McLean admitted he was an educated, successful businessman, the president of a large trucking company which under his management and direction had expended a million dollars in buildings constructed in Winston-Salem and an equal amount elsewhere. He had access to

the document from which Mr. Bolich gave him the figure showing $1,819,908 to be the estimated replacement cost as of 1949. Bolich told him the plaintiffs had an equity of $187,000 in the property and that they would take that amount for their stock. McLean immediately offered $175,000. The deal "hung fire" for two weeks and was finally closed for $182,500. The plaintiffs refused for two weeks to take $175,000, holding out for $187,000. If they were intentionally trying to unload worthless stock they were unhurried about it, to say the least. After all, the difference between the value of the property and the amount of the mortgage constituted the equity. The amount of the mortgage was known. The value of the property, however, was necessarily a matter of opinion. It does not appear to have been represented as anything else. Under the decisions of this Court, such representations do not constitute fraud. *McCormick v. Jackson*, 209 N.C. 359, 183 S.E. 369; *Laundry Machinery Co. v. Skinner*, 225 N.C. 285, 34 S.E. 2d 190; *Cox v. Johnson*, 227 N.C. 69, 40 S.E. 2d 418.

The general rule is that the mere expression of an opinion or belief, or more precisely, a representation which is nothing more than the statement of an opinion, cannot constitute fraud. 37 C.J.S. 226, citing cases from the Federal courts and from the appellate courts of 26 of the states, including the case of *American Laundry Machinery Co. v. Skinner, supra*, decided by this Court.

The remaining question relates to the alleged representations that the structures were erected in accordance with plans and specifications approved by the Federal Housing Administration. The gist of defendant's claim of fraudulent representations is embodied in his own words: "Before I signed the paper that Mr. Sandridge had here this morning, we asked Mr. Lester and Mr. Burge, both, or Mr. Bolich asked him if the project had been built in accordance with the plans and specifications and Mr. Bolich said, 'there is the two men that built it, ask them,' and they said it had; said, 'if it hadn't been, we couldn't have gotten the money.' And they sent up to the bank and got Mr. Styers down to verify that the money had been paid out on the project; . . . I was induced to sign the contract by the representations on which I relied that it was an FHA project and the people who built it were standing there saying it had been built in accordance with the plans and specifications of FHA and it had a 33-year mortgage on it."

It appears from all the evidence that at the time of the sale and transfer of the stock the defendant had never seen the plans and specifications and did not know what was in them. At the time he bought, he apparently relied upon his surmise or conjecture, and nothing else, as to what plans and specifications the Federal Housing Administration had approved. It is difficult to understand how the defendant could have

been deceived when he did not know what the plans called for. The defendant offered the evidence of Mr. Stirewalt, a contracting foreman, "found to be an expert in the field of building," who testified he had examined the plans and specifications obtained from the Federal Housing Administration and had made a careful inspection of the structures on the project. He described in detail the defective workmanship and the substitution of the materials different from and inferior to those called for in the plans and specifications, and concluded: "In my estimation it would be almost an utter impossibility to make the project like the plans and specifications called for. Roughly, I would say it would take between two hundred and fifty and three hundred thousand dollars to make it substantially comply with the plans and specifications."

It is apparent from Mr. Stirewalt's testimony that he examined the plans as originally drawn and submitted to the Federal Housing Administration. The date when he made his examination is not given but apparently it was after the defendant had made material alterations in the structures, "in order to render them suitable for white occupancy." On 21 August, 1951, approximately six months after Mr. McLean went into possession, he made application to the Federal Housing Administration for permission to increase the rents. In transmitting the application, his attorney said: "I think I should also point out that we have gone to tremendous expense in the renovation of this property to convert the same for use to white occupants. The outlay, in addition to repairs . . . already exceeds $30,000." Mr. Stirewalt's examination showing structural changes and materials different from the plans was evidently made after the "renovation." In his examination he used the original plans and apparently did not take into account the changes agreed upon during the progress of the work as testified to by the defendant's other witnesses, Coble and Pollard. The original plans were not the plans by which the buildings were constructed. The plans as changed by agreement were the plans by which the structures should be judged. The changes had been made and the buildings completed months before McLean first heard of the project from Mr. Bolich. In this connection, Ed Coble, a defendant's witness, testified in substance that he was construction examiner for the Federal Housing Administration until the Park Terrace project was about half completed, then he became chief architect. He inspected the property and made suggestions and approved cheaper stoves than those called for in the specifications, on condition that cabinets be substituted for shelves in the kitchens. His inspections showed that streets and service drives were different from the plans but that the actual construction was an improvement and more expensive than the plans called for. However, in

certain particulars the plans had not been strictly followed. "When all of the apartments had been constructed and the owners had asked FHA to insure the loan and for the final payment to be made, FHA made what was called a final inspection . . . before the last money was disbursed. It is set up by FHA as the final inspection . . . FHA did have a final inspection made of this project and they accepted the project . . . Yes, sir, that meant essentially that we accepted it as built in accordance with the plans and specifications . . . On the basis of FHA's records, the inspection reports contained therein, my own visits, and the inspections the various inspectors had made on the job, if I had been asked on February 15, 1951, with this material before me whether or not in my opinion the project had been completed according to the plans and specifications and finally approved by FHA, I would have had to say yes, sir, to the best of my information at that time, that would have been my honest opinion."

Pollard, another defense witness, testified: "Well, so far as I know, Park Terrace was built in accordance with the plans and specifications of FHA, except to the extent that those plans may have been modified from time to time by mutual consent."

Taking the evidence in the light most favorable to the defendant as must be done in passing on the motion to dismiss his counterclaims, it seems the evidence of Coble and Pollard, who kept up with the work and changes in plans as the work progressed, would have warranted the plaintiffs in expressing the opinion that the structures had been completed in accordance with the FHA's plans and specifications. Coble was chief architect for the Federal Housing Administration. He represented the guarantor. Pollard was president of Park Terrace. He represented the mortgagor. Both were of the opinion the structures conformed to the plans. There is nothing in the record to indicate Lester and Burge had a different opinion. The burden of the issue was on the defendant. To constitute fraud, there must be a false representation, known to be false, or made with reckless indifference as to its truth, and it must be made with the intent to deceive. *Electric Co. v. Morrison*, 194 N.C. 316, 139 S.E. 455; *Peyton v. Griffin*, 195 N.C. 685, 143 S.E. 525; *Harding v. Ins. Co.*, 218 N.C. 129, 10 S.E. 2d 599; *Cash Register Co. v. Townsend*, 137 N.C. 652, 50 S.E. 306; *Frey v. Lumber Co.*, 144 N.C. 759, 57 S.E. 464; *Vail v. Vail*, 233 N.C. 109, 63 S.E. 2d 202; *Berwer v. Ins. Co.*, 214 N.C. 554, 200 S.E. 1; *Ward v. Heath*, 222 N.C. 470, 24 S.E. 2d 5.

The contract entered into by the parties was written. It was signed and sealed by the parties in the presence and by advice of counsel. All discussion, all representations were designed to, and did culminate in the contract. While these actions are grounded in tort and not in con-

tract, yet the contract is admissible as evidence of what was actually agreed to by the parties. The pertinent part of the contract is paragraph 4, which is here quoted:

"(4) The purchaser agrees, and has by this contract accepted the real estate and all improvements located thereon which is owned by the corporation in its present condition, and agrees that no claim shall be made against the parties of the first part individually or against Park Builders, Inc., or J. A. Bolich, Jr., of any nature whatsoever because of defective workmanship, defective or inferior building materials in the structures located on said premises, and also because of any breakage or wear and tear that has heretofore occurred to any of the structures or fixtures located in said structures, it being definitely understood and agreed that the premises and all structures erected thereon and fixtures attached thereto are accepted in their present condition, and no guarantee of their condition is made by the parties of the first part, Park Builders, Inc., or J. A. Bolich, Jr. The above stipulation shall not apply to two apartments located on said premises which have been damaged by fire and which the parties of the first part agreed to restore to their original condition at their own expense. It is agreed between the parties hereto that payments from an insurance company or companies shall go to the parties of the first part as a part of the expense of repairing the two apartments that have been damaged by fire."

The evidence of defendant's witnesses Coble and Pollard, the inspections made by the defendant, his attorney, the other officers of his company, and by 60 of his employees, and his admission that he had unlimited opportunity to inspect the property and go over it with a fine tooth comb, the terms of the contract, and the fact the defendant made the payments on the notes as they became due for 15 months after he went into the possession of the property would seem not only to explain but also to destroy all implications of fraud disclosed by this record.

The judgments of the Superior Court of Forsyth County are

Affirmed.