ROY H. JOHNSON, W. CONNETTE JOHNSON, FOREST H. HARMON, LEWIS E. LAMB, JR., AND ALVIN A. STURDIVANT, JR., D/B/A KERNERS VILLAGE COMPANY v. PHOENIX MUTUAL LIFE INSURANCE COMPANY AND CAMERON-BROWN COMPANY

No. 68

(Filed 3 June 1980)

1. Fraud § 1— elements

To make out a case of actionable fraud, plaintiffs must show that defendant made a representation relating to some material past or existing fact; the representation was false; defendant knew the representation was false when it was made or made it recklessly without any knowledge of its truth and as a positive assertion; defendant made the false representation with the intention that it should be relied upon by plaintiffs; plaintiffs reasonably relied upon the representation and acted upon it; and plaintiffs suffered injury.

2. Fraud § 3.1— promissory representation—intent to deceive

As a general rule, a mere promissory representation will not be sufficient to support an action for fraud, but a promissory misrepresentation may constitute actionable fraud when it is made with intent to deceive the promisee, and the promisor, at the time of making it, has no intent to comply.

3. Fraud § 12— construction of shopping center—mortgage broker—representations about substituting tenants—summary judgment proper

In an action to recover for fraud by defendant, who had been given the exclusive right to negotiate a permanent mortgage loan for plaintiff partners to construct a shopping center, defendant was entitled to summary judgment where plaintiffs based their action for fraud on allegations that an employee of defendant had made statements concerning the substitution of tenants in the shopping center and the effect of such substitution on the lender's loan commitment which amounted to a fraudulent misrepresentation, but depositions and affidavits before the trial court indicated that the statements were in fact true; there was no difficulty in obtaining the consent of defendant lender to substitute tenants in the shopping center; the problems encountered by plaintiff partnership in developing the project were caused by its inability to secure

tenants who were willing to enter into leases; and there was no evidence that defendant mortgage broker and defendant lender contributed in any way to the problems which were involved in securing the tenants.

**4. Unfair Competition § 1— unfair or deceptive practice—trade or commerce— relationship between borrower and mortgage broker**

Before a trade practice can be declared unfair or deceptive, it must first be determined that the practice or conduct which is complained of takes place within the context of the language of G.S. 75-1.1 pertaining to trade or commerce; the relationship of borrower and mortgage broker and the activities which are appurtenant to it are components of the larger concept of trade or commerce, though no tangible property of any kind moves through commerce because of this relationship, since an exchange of value does occur as a result of the process of securing a broker as the representative of the potential borrower.

**5. Unfair Competition § 1— unfair trade practice**

A trade practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

**6. Unfair Competition § 1— unfair trade practice—inequitable assertion of power or position**

A party is guilty of an unfair trade practice or act when it engages in conduct which amounts to an inequitable assertion of its power or position.

**7. Unfair Competition § 1— shopping center construction—mortgage broker— representations about substituting tenants—no unfair trade practice**

· In an action to recover from defendant who had been given the exclusive right to negotiate a permanent loan for plaintiff partners to construct a shopping center, defendant mortgage broker did not engage in any conduct which would amount to an unfair trade practice where defendant was at all times cooperative, doing what it could as an intermediary with defendant lender so as to secure for plaintiff partnership the terms and modifications it desired to have; as a result of defendant broker's efforts there was no difficulty posed in obtaining the consent of defendant lender for substitution of tenants; there was no evidence that defendant broker exerted itself in any manner which would have contributed to the problem of securing tenants for plaintiff's shopping center; and there was no evidence that defendant broker had anything to do with the construction lender's withdrawal from the shopping center project.

**8. Unfair Competition § 1— deceptive trade practice**

A trade practice or act is deceptive if it has the capacity or tendency to deceive, and in determining whether a representation is deceptive, its effect on the average consumer is considered.

**9. Unfair Competition § 1— mortgage broker—no deceptive trade practice**

The trial court did not err in granting defendant mortgage broker's motion for summary judgment as to plaintiff's claim for relief based on a deceptive trade practice where nothing in the depositions or affidavits supported

the view that statements by defendant's employee were deceptive, and defendant at all times undertook to keep plaintiff partnership accurately and clearly informed of the state of affairs concerning the loan commitment from defendant lender.

**10. Brokers and Factors § 6; Contracts § 21— mortgage broker—contract to obtain financing—broker entitled to fee**

Plaintiff's contention that defendant mortgage broker contracted to obtain permanent financing for plaintiff upon certain terms and conditions and that defendant should refund its placement fee of $13,000 because financing was never obtained was without merit, since defendant had no other obligation toward plaintiff than to negotiate a permanent loan commitment; defendant did obtain a mortgage loan commitment for plaintiff with defendant lender which was accepted in a revised fashion; and having obtained a loan commitment from defendant lender which was accepted by plaintiff, defendant mortgage broker earned its fee under the terms of the contract.

APPEAL by defendant Cameron-Brown from the decision of the Court of Appeals reported in 44 N.C. App. 210, 261 S.E. 2d 135 (1979), affirming in part and reversing in part the judgment of *McConnell, J.,* at the 24 April 1978 Schedule A Session of FORSYTH Superior Court granting motions of defendants for summary judgment.

This is an action for damages arising out of the unsuccessful efforts of plaintiffs to develop a shopping center at the intersection of Interstate 40 and North Carolina Highway 150 in the Town of Kernersville, North Carolina. Plaintiffs and Troy N. Wood were the original partners in the Kerners Village Company (hereinafter referred to as KVC), which had been formed in March 1973 to develop the proposed shopping center. Subsequently, Wood sold his partnership interest to KVC in October 1973, and his interest was thereafter purchased by Alvin A. Sturdivant, Jr.

In May 1973, KVC entered into a written contract with defendant Cameron-Brown Company which gave Cameron-Brown the exclusive right to negotiate a permanent mortgage loan for the partnership in the amount of $1,350,000 with an interest rate of 8½ percent. At the time KVC authorized Cameron-Brown to seek a loan commitment, KVC had negotiated four leases for tenants for the proposed shopping center: Lowe's, Mack's, Revco, and Goodyear. Bill Mullins, an agent for Cameron-Brown, and KVC regarded these firms as major credit tenants. Negotiations were then under way between the partnership and two other

firms who were potential tentants: Sears and the Bank of North Carolina.

As a result of Mullins' efforts, the Phoenix Mutual Life Insurance Company (hereinafter referred to as Phoenix) tendered a commitment to KVC on 20 July 1973 for a fifteen-year loan of $1,300,000 at 9 percent interest. KVC accepted the commitment in a letter dated 30 July 1973, subject to two conditions not relevant to the disposition of this appeal. On 14 August 1973, Phoenix modified its loan commitment offer along lines similar to those suggested by KVC, and KVC accepted the offer as modified on 30 August 1973.

The permanent loan commitment by Phoenix was conditioned on there being in effect at the time of the closing leases to Lowe's Foods, Inc., Mack's Stores, Inc., Revco, Inc., Goodyear Tire and Rubber Co., the Bank of North Carolina, and Sears, for terms of fifteen or twenty -years, each at a specified annual rent. The loan commitment was further conditioned on KVC finding an interim construction lender who was reasonably acceptable to Phoenix. The commitment provided that it could be terminated at the election of Phoenix if the construction loan agreement was not delivered to it within ninety days of the permanent loan commitment.

On 17 September 1973, NCNB Mortgage Corporation (hereinafter referred to as NCNB) tendered a loan commitment to KVC which was accepted by the partnership. It was at about this time that the project began to encounter difficulties. Sears declined to enter into a lease for a catalog store. Further discussions thereafter took place which resulted in a reduction in the square footage of the project, as well as a reduction in the loan commitment of Phoenix to the sum of $1,200,000.00. After negotiations with Sears ended, the partnership entered into discussions with Pic-'N-Pay Shoes. On 22 January 1974, Phoenix advised Mullins that Pic-'N-Pay would be an acceptable tenant to replace Sears. Phoenix went on to inform Mullins that it would require $140,260 per year in credit lease income, including the bank lease, to substantiate the loan. This information was passed on to KVC.

KVC thereafter failed to secure a lease commitment from the Bank of North Carolina or any other bank. Because of the difficulties involved in securing leases and the inability of the partnership to raise the $100,000 difference in permanent loan financing,

NCNB refused to advance funds for construction. During these delays, construction costs increased, requiring the renegotiation of leases that had been signed. Subsequent negotiations with Phoenix proved unsuccessful, and Phoenix terminated its commitment in a letter dated 16 July 1974.

On 14 June 1977, plaintiffs filed this action against Cameron-Brown and Phoenix alleging that defendants had entered into a deliberate course of conduct which was designed to force KVC into an untenable economic position so that it would be unable to complete the project; that Phoenix cancelled its original loan commitment and issued a new one at a higher rate of interest with a holdback clause for $250,000 knowing that it would be unacceptable to the partnership; that the conduct of Phoenix and Cameron-Brown amounted to unfair and deceptive trade practices in violation of Chapter 75 of the North Carolina General Statutes; and that the standby fee collected by Phoenix and the placement fee received by Cameron-Brown were unearned and ought to be returned.

Defendants answered plaintiffs' complaint and denied liability for any damage sustained by KVC. On 17 March 1978, defendant Cameron-Brown moved for summary judgment, alleging that there were no genuine issues as to any material fact. On 20 March 1978, defendant Phoenix moved for summary judgment in its own right. Both motions were granted and judgment in favor of defendants was entered on 18 May 1978.

The Court of Appeals, in an opinion by Judge Wells, concurred in by Judge Erwin, affirmed the trial court as to Phoenix but reversed the trial court as to Cameron-Brown. Judge Clark dissented, and Cameron-Brown appealed pursuant to G.S. 7A-30(2).[1]

*Badgett, Calaway, Phillips, Davis & Montaquila, by Chester C. Davis, for plaintiff-appellees.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, by John L. Jernigan, for defendant-appellant Cameron-Brown.*

---

1. Plaintiffs did not petition this Court for discretionary review of the decision of the Court of Appeals as to Phoenix.

BRITT, Justice.

Cameron-Brown argues that it is entitled to summary judgment as to each of plaintiffs' claims for relief as a matter of law. The Court of Appeals disagreed, holding that the materials presented at the summary judgment hearing in support of the motions provided a sufficient forecast of evidence that Cameron-Brown, through its agent Mullins, could have deceived and misled plaintiffs. Our deliberations dictate the conclusion that summary judgment was properly entered in favor of Cameron-Brown. Accordingly, we reverse the Court of Appeals.

We note initially that we do not reach the issue of whether plaintiffs' complaint sufficiently alleges a claim for relief sounding in fraud. While it is unquestioned that the Rules of Civil Procedure, G.S. 1A-1, envisioned the notice theory of pleading, *see* *Sutton v. Duke*, 277 N.C. 94, 176 S.E. 2d 161 (1970), Rule 9(b) requires that the circumstances constituting fraud shall be stated with particularity. *Mangum v. Surles*, 281 N.C. 91, 187 S.E. 2d 697 (1972). In disposing of this appeal, we assume, without deciding, that plaintiffs' complaint was sufficient to withstand a challenge to its particularity of averment. Nor do we reach the issue of whether plaintiffs' claims are barred by the statute of limitations. We assume, *arguendo*, that plaintiffs filed their complaint within its parameters.

The issue thus turns on the sole question of whether Cameron-Brown is entitled to summary judgment as a matter of law as to all of plaintiffs' claims for relief. The resolution of this issue requires that plaintiffs' allegations of fraud, as well as unfair and deceptive trade practices, be examined in light of the nature of summary judgment and the standard by which it is to be applied.

Summary judgment is the device whereby judgment is rendered if the pleadings, depositions, interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law. N.C. R. Civ. P. 56; *see* 10 C. Wright & A. Miller, Federal Practice and Procedure § 2711 (1973). The party moving for summary judgment has the burden of clearly establishing the lack of any triable issue of material fact by the record properly before the court. *Caldwell v. Deese*, 288

N.C. 375, 218 S.E. 2d 379 (1975); *Page v. Sloan,* 281 N.C. 697, 190 S.E. 2d 189 (1972); 10 C. Wright & A. Miller, *supra* § 2727.

Summary judgment may not be imposed in a vacuum. The examination of the propriety of its entry must not conclude with the determination that there are no genuine issues of material fact. The very terms of Rule 56 require that it also be established that the movant be entitled to judgment as a matter of law. The second prong of the test may be effected only when the evidence which is offered in support of the motion is examined in light of the substantive rules of law as they relate to a plaintiff's claim for relief. In the case at bar, plaintiffs sought relief alleging fraud as well as unfair and deceptive trade practices on the part of defendant Cameron-Brown. Our inquiry must now turn to a consideration of the essential elements which must be shown to support a recovery on causes of action which are founded upon such allegations.

[1] To make out a case of actionable fraud, plaintiffs must show: (a) that defendant made a representation relating to some material past or existing fact; (b) that the representation was false; (c) that defendant knew the representation was false when it was made or made it recklessly without any knowledge of its truth and as a positive assertion; (d) that defendant made the false representation with the intention that it should be relied upon by plaintiffs; (e) that plaintiffs reasonably relied upon the representation and acted upon it; and (f) that plaintiffs suffered injury. *E.g., Ragsdale v. Kennedy,* 286 N.C. 130, 209 S.E. 2d 494 (1974); *see also Odom v. Little Rock & I-85 Corp.,* 299 N.C. 86, 261 S.E. 2d 99 (1980).

Using the *Ragsdale* case as a point of departure, we now turn our attention to an examination of the affidavits and other materials which were presented at the hearing on the motion for summary judgment.

[3] In support of its motion for summary judgment, Cameron-Brown presented the depositions of each of the partners in KVC, as well as the deposition of Frederick A. Osmers, a real estate investment officer with Phoenix, and the deposition and affidavit of Mullins, Cameron-Brown's agent. In addition, the trial court had before it numerous exhibits, consisting of agreements, letters, and memoranda which related to the development and financing of the

proposed shopping center. Though the depositions and exhibits are voluminous, detailing the complex series of events which surrounded the activities of the partnership as it sought to develop the project, resolution of the issue before us depends on a consideration of the statements by Mullins of Cameron-Brown concerning the substitution of tenants.

In May 1973, KVC entered into a contract with Cameron-Brown which gave Cameron-Brown the exclusive right to negotiate a permanent mortgage loan for the partnership in the amount of $1,350,000 with an interest rate of 8½ percent. At the time of this authorization, KVC had already negotiated four leases with tenants for the proposed shopping center: Lowe's, Mack's, Revco, and Goodyear.

Though they disagree as to the date of the meeting, Roy H. Johnson and Troy N. Wood, through their depositions, and Mullins, through his affidavit, agree that sometime in late July 1973, the partners in KVC met with Mullins at Cameron-Brown's Raleigh office. At that time, Mullins and the partners went over the loan commitment from Phoenix that was embodied in a letter dated 20 July 1973. The commitment provided, *inter alia*, that at the time of closing there were to be leases in effect to certain specified tenants including the four mentioned above, as well as to Sears and the Bank of North Carolina.

According to Mullins' affidavits, the partners asked a number of questions at the meeting, one of which was the possible consequence of their failure to secure a lease from Sears. Mullins replied that "[he] thought they would be allowed to substitute another credit tenant so long as Phoenix was satisfied that the substitute tenant had an equal credit rating and would contribute comparable income to the center." In his deposition, Johnson agrees that the subject of substitution came up at the meeting. It was his recollection that "[Mullins] led us to believe that there was no problem [about substitution]." Although he was not a partner in KVC at the time of the meeting, Alvin A. Sturdivant noted in his deposition that he had been told by Johnson that Mullins had assured him that "substitutions would be no problem." In his deposition, Lewis E. Lamb, Jr., stated that Mullins told his partners that it did not make any difference if Sears entered into a lease. The group did not sign the commitment at that time

because the partners wanted to review it further. Thereafter, the partners signed the commitment letter of 20 July 1973 to acknowledge their acceptance of its terms and delivered it to Cameron-Brown's office in Raleigh.

Though the depositions and the affidavit differ in their formulation of what Mullins actually said to the partners as they reviewed the terms of the commitment, the substance of the statement is clear: Mullins did not think that substituting another tenant for Sears would pose a problem. The essence of plaintiffs' argument is that this statement amounts to a fraudulent misrepresentation. We do not find this argument persuasive.

[2]   As a general rule, a mere promissory representation will not be sufficient to support an action for fraud. *Pierce v. American Fidelity Fire Ins. Co.*, 240 N.C. 567, 83 S.E. 2d 493 (1954); *McCormick v. Jackson*, 209 N.C. 359, 183 S.E. 369 (1936). A promissory misrepresentation may constitute actionable fraud when it is made with intent to deceive the promisee, and the promisor, at the time of making it, has no intent to comply. *Ragsdale v. Kennedy, supra; Vincent v. Corbett*, 244 N.C. 469, 94 S.E. 2d 329 (1956). A mere recommendation or statement of opinion ordinarily cannot be the basis of a cause of action for fraud. *Myrtle Apartments, Inc. v. Lumberman's Mut. Casualty Co.*, 258 N.C. 49, 127 S.E. 2d 759 (1962); *Lester v. McLean*, 242 N.C. 390, 87 S.E. 2d 886 (1955).

[3]   While there is some variation among the depositions and the affidavit as to what Mullins actually said regarding the substitution of tenants, we do not think that the character of the representations is determinative of this case. Assuming, *arguendo*, that the statements amount to more than promissory representations or opinions, they are insufficient to serve as a foundation of a claim for relief which sounds in fraud. Though the statements are sufficient to support an inference that they are definite and specific representations which relate to some material past or existing fact, the evidence adduced at the hearing on the motion for summary judgment establishes that the statements complained of were in fact truthful.

The evidence is uncontroverted that during September 1973, McAuliffe and Associates, KVC's leasing agent for the shopping center, informed the partnership that Sears had declined to enter

into a lease for a catalog store. At the same time, the agent informed the partnership that Pic 'N Pay Stores, Inc., would enter into a lease for less space than Sears would have occupied. During this period, Lowe's orally expressed an intention to increase its annual rent to cover anticipated cost overruns in the construction of its store. All of this information was communicated to Mullins orally. On 20 September 1973 and again on 1 October 1973, Mullins, at the request of KVC, wrote Osmers requesting that the original loan commitment be modified. By a letter dated 9 October 1973, Mullins further advised Osmers that the space which had been allocated to local tenants would be reduced from 21,000 square feet to 17,000 square feet. Prior to this time, on 17 September 1973, NCNB had issued a construction loan commitment to KVC.[2] This commitment was signed by all of the plaintiffs on 22 October 1973.[3]

On 25 October 1973, Osmers responded to Mullins' correspondence, advising that the requested modifications, if they were accepted, would probably result in some reduction in the amount of the loan. Osmers' reply noted that the existing lease with Lowe's guaranteed less annual rent than that which had been specified in the original loan commitment. Osmers went on to say that Phoenix would extend the deadline for submitting the required buy-sell agreement until 1 December 1973 and requested that he be provided with an executed copy of the Pic 'N Pay lease.

By a letter dated 27 November 1973, Osmers advised KVC that the finance committee of Phoenix had agreed to amend the commitment so as to reduce the amount of the loan by $100,000, to reduce the monthly payments, and to reduce the amount of rent to be paid by Lowe's Foods, Inc. The commitment was further amended to provide that the provisions which called for a lease to Sears for a catalog store be deleted in favor of substituting a lease to Pic 'N Pay for five years at an annual rent of $8,000.00.

2. Neither Phoenix nor Cameron-Brown had any involvement with the proposed construction loan.

3. Sturdivant became a partner in KVC in mid-October 1973, replacing Wood. In subsequent months, he became the principal spokesman for the partnership because of his twenty years' experience as a contractor and real estate developer.

The proposed amendment was submitted to KVC by Mullins at a meeting in Winston-Salem on or about 1 December 1973. At that meeting, McAuliffe assured plaintiffs that a lease with Pic 'N Pay was forthcoming. In his deposition, Sturdivant acknowledged that the proposed amendment incorporated all of the modifications which were sought by KVC at that time and that plaintiffs were satisfied that the project could be completed. The partnership accepted the amendment on 4 December 1973.

Despite the earlier assurances to the contrary, McAuliffe orally informed KVC in mid-December 1973 that Pic 'N Pay had declined to enter into a lease. By a letter dated 4 January 1974, McAuliffe notified the partnership that Pic 'N Pay's decision was final.

During January further discussions were had between KVC and NCNB, the construction lender. NCNB was unwilling to advance funds for construction until it was satisfied that the requirements of the Phoenix commitment concerning the unexecuted leases (Pic 'N Pay and a bank) could be met, as well as being satisifed that the partnership could provide the $100,000 which was needed to bridge the gap between the amount of the construction loan and the permanent loan.

At about the same time that the discussions with NCNB were had Sturdivant raised the same issues with Mullins. On 7 January 1974, Mullins wrote Osmers requesting that KVC be allowed to substitute a comparable credit tenant for Pic 'N Pay, as well as seeking advice as to the amount of credit tenant income that would be necessary to sustain the loan and the amount Phoenix would lend if KVC could not find a tenant to replace Pic 'N Pay. Osmers replied by way of a memorandum dated 22 January 1974 that Phoenix would allow the substitution of another satisfactory credit tenant for Pic 'N Pay and that Phoenix would require at least $140,000 in annual credit lease income, including the bank ground lease, to fund a loan in the amount of $1,200,000.00.

On 13 February 1974, Sturdivant wrote Mrs. Geneva McGrath of Cameron-Brown[4] that KVC had been unable to satisfy the construction lender concerning the unexecuted leases, that

4. Mullins left Cameron-Brown for another job on 31 January 1974.

construction costs had gone up, and that KVC had to renegotiate the duration of all the leases (and the rental on some). The letter concluded with the suggestion that Cameron-Brown and Phoenix refund the fees that KVC had paid and that the project start all over. This information was passed on to Phoenix. Osmers replied that Phoenix was willing to extend the commitment it had made if it were paid an additional $13,000.00.

Thereafter, Sturdivant, continuing to act for the partnership, corresponded with Michael S. Clapp of Cameron-Brown, seeking to revise the Phoenix loan commitment again. The substance of the discussion was embodied in a letter to Osmers dated 14 March 1974 which confirmed that KVC was considering the proffered extension and requested Osmers' opinion as to the possibility of increasing the amount of the loan to $1,300,000 if the leases on an attached schedule could be secured. The schedule proposed eliminating Pic 'N Pay and the bank ground lease. Osmers replied that the proposed schedules could not justify a loan in excess of $1,237,500.00.

By a letter dated 1 May 1974, Sturdivant outlined to Clapp the various problems which were facing KVC and requested a new commitment which would require only the four existing credit tenants (Lowe's, Mack's, Revco, and Goodyear) and an option from a bank for a ground lease. The proposal was forwarded to Osmers who concluded that it would justify a loan in the amount of $1,250,000.00. Osmers then submitted this conclusion to the policy committee on 10 June 1974. The policy committee accepted the recommendation but determined that $250,000 would be held back pending completion of the project and occupancy by the tenants. By its own terms, the new commitment offer required that it be accepted by 1 July 1974. Following KVC's failure to accept the offer in apt time, Phoenix advised the partnership in a letter dated 16 July 1974 that it was terminating the original commitment

> . . . because of the failure to deliver to us evidence of the closing of your construction loan on papers and with a lender acceptable to us and your failure to deliver to us the undertaking of the lender to assign the loan to us, all as contemplated by paragraph number 17 of the original commitment letter of 20 July 1973.

By a letter dated 19 July 1974, Sturdivant confirmed that KVC had rejected the proposed commitment, advised that the project had been postponed indefinitely, and requested refund of the fees which had been paid to Cameron-Brown and Phoenix. Cameron-Brown and Phoenix declined to make any refund.

From the foregoing discussion it is clear that Mullins' statements that substitution of tenants would pose no problem were true. Phoenix agreed to substitute Pic 'N Pay for a Sears Catalog Store. When Pic 'N Pay declined to enter into a lease at the shopping center, Osmers informed the partnership that Phoenix was willing to substitute another tenant for Pic 'N Pay. Furthermore, in June 1974, Phoenix indicated that it was willing to enter into a commitment which called for only the four existing leases and an option from a bank for a ground lease. The record indicates without contradiction that Phoenix was willing to accommodate the partnership's requests for modification of the original commitment so that the project could go forward. The record further establishes that Cameron-Brown actively sought to assist KVC in obtaining the requested modifications from Phoenix. There is no evidence in the record that either Phoenix or Cameron-Brown sought to influence NCNB who terminated its construction loan commitment in May 1974. Nor is there any evidence that either Cameron-Brown or Phoenix interfered with the efforts of McAuliffe and KVC to secure tenants for the project. It is clear from the record that neither of the defendants had any obligation to obtain leases for the project.

The evidence which was presented at the hearing on the motion for summary judgment makes it apparent that Mullins' statements were true; there was no difficulty in obtaining the consent of Phoenix to substitute tenants in the shopping center. The same evidence also establishes that the problems which were encountered by the partnership in developing the project were caused by its inability to secure tenants who were willing to enter into leases. The record is utterly barren of any evidence which would tend to show that Phoenix and Cameron-Brown contributed in any way to the problems which were involved in securing these tenants.

It necessarily follows that the evidence which was adduced at the hearing on the motion for summary judgment was sufficient

to forecast that the evidence to be introduced at trial by plaintiff would be inadequate as a matter of law to establish a *prima facie* case which sounds in fraud. There is absolutely no evidence which tends to show that Mullins' statements were false.

Allegations of fraud do not readily lend themselves to resolution by way of summary judgment because a cause of action based on fraud usually requires the determination of a litigant's state of mind. *See, e.g., Fogarty v. Security Trust Co.*, 532 F. 2d 1029 (5th Cir. 1976); *Weiss v. Kay Jewelry Stores, Inc.*, 470 F. 2d 1259 (D.C. Cir. 1972); *American Nat. Bank & Trust Co. of Chicago v. Certain Underwriters at Lloyd's of London*, 444 F. 2d 640 (7th Cir. 1971). A litigant's state of mind is seldom provable by direct evidence but must ordinarily be proven by circumstances from which it may be inferred. *See, e.g., State v. Bell*, 285 N.C. 746, 208 S.E. 2d 506 (1974). This renders summary judgment inappropriate in a fraud case where the court is called upon to draw a factual inference in favor of the moving party, *see Kubik v. Goldfield*, 479 F. 2d 472 (3d Cir. 1973); or where the court is called upon to resolve a genuine issue of credibility. *Kubik v. Goldfield, supra; Associated Hardware Supply Co. v. Big Wheel Distributing Co.*, 355 F. 2d 114 (3d Cir. 1966); *see generally* 6 Moore's Federal Practice ¶ 56.17[27] (1980). However, the issue of fraud may be summarily adjudicated when it is clearly established that there is no genuine issue of material fact. *E.g., Caplan v. Roberts*, 506 F. 2d 1039 (9th Cir. 1974); *Securities and Exchange Comm'n v. Geyser Minerals Corp.*, 452 F. 2d 876 (10th Cir. 1971). We have demonstrated above that no genuine issue of material fact exists in the present case. The evidence which was presented at the hearing on the motion for summary judgment showed without contradiction that Mullins' statements were true. Therefore, an essential element of a cause of action sounding in fraud could not be proven at trial. Accordingly, the issue of Mullins' state of mind as to whether he made his representations knowing them to be false when they were made or in reckless disregard of whether or not they were truthful does not come into consideration here.

[4] We now turn our attention to a consideration of whether the conduct of Cameron-Brown amounts to an unfair and deceptive trade practice within the purview of G.S. § 75-1.1. At the time plaintiffs' cause of action accrued, the statute provided, in pertinent part, that

Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful. G.S. § 75-1.1 (1975).

By its very terms, the statute declares unfair or deceptive acts or practices in the conduct of any trade or commerce to be unlawful. The facts which gave rise to the present litigation involve the relationships of borrower and lender, as well as borrower and broker. Before a practice can be declared unfair or deceptive, it must first be determined that the practice or conduct which is complained of takes place within the context of the statute's language pertaining to trade or commerce. In the present case, it must be decided whether the relationship of borrower and mortgage broker and the activities which are appurtenant to it are components of the larger concept of trade or commerce. If they are not, then the statute is of no import, and our inquiry is at an end.

"Commerce" in its broadest sense comprehends intercourse for the purposes of trade in any form. *Adair v. United States*, 208 U.S. 161, 52 L.Ed. 436, 28 S.Ct. 277 (1908); *Welton v. Missouri*, 91 U.S. (23 Wall.) 275, 23 L.Ed. 347 (1876); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824); *State ex rel. Edmisten v. J. C. Penney Co.*, 292 N.C. 311, 233 S.E. 2d 895 (1977). The use of the word "trade" interchangeably with the word "commerce" indicates that the statute contemplated a narrower definition of commerce which would comprehend an exchange of some type. *State ex rel. Edmisten v. J. C. Penney Co., supra.*[5] By enacting G.S. 75-1.1, as it was in effect during the attempted development of the shopping center, the General Assembly expressed its concern with insuring openness and fairness in those activities in which a participant could be characterized as a seller. *State ex rel. Edmisten v. J. C. Penney Co., supra.* The relationship of borrower and mortgage broker involves such activities. The broker is manifestly engaged

---

5. We note that in the wake of our decision in *Penney* the General Assembly amended G.S. 75-1.1, in part, to read as follows:

(a) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.

(b) For purposes of this section, "commerce" includes all business activities, however denominated, but does not include professional services rendered by a member of a learned profession. 1977 N.C. Sess. Laws c. 747.

in the business of selling his services in procuring a loan which is most favorable to the needs and resources of the potential borrower who, in turn, has sought to obtain a broker who can best represent his interests in securing proper financing. While no tangible property of any kind moves through commerce because of this relationship, an exchange of value does occur as the result of this process of securing a broker as the representative of the potential borrower. It is clear, therefore, that the activities of Cameron-Brown with regard to its relationships to KVC come within the purview of the statute. Whether these activities amount to unfair or deceptive trade practices is another question.

The language of G.S. § 75-1.1 closely resembles that employed by Section 5(a)(1) of the Federal Trade Commission Act which provides that

> Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful. 15 U.S.C. § 45(a)(1) (1976).

The similarity in language apparently was not accidental. *State ex rel. Edmisten v. J. C. Penney Co., supra; see generally,* Morgan, *The People's Advocate in the Marketplace—The Role of the Attorney General in the Field of Consumer Protection,* 6 Wake Forest Intra. L. Rev. 1 (1969). Because of the similarity in language, it is appropriate for us to look to the federal decisions interpreting the FTC Act for guidance in construing the meaning of G.S. § 75-1.1. *Hardy v. Toler,* 288 N.C. 303, 218 S.E. 2d 342 (1975); *see generally* Note, 12 Wake Forest L. Rev. 484 (1976).

While Section 5 of the FTC Act undertakes to proscribe "unfair or deceptive acts or practices in or affecting commerce", the precise meanings of these terms are not enunciated by the statute itself. It is critical that the generality of these standards of illegality be noted. *Federal Trade Comm'n v. Colgate-Palmolive Co.,* 380 U.S. 374, 13 L.Ed. 2d 904, 85 S.Ct. 1035 (1965); *see generally Atlantic Refining Co. v. Federal Trade Comm'n,* 381 U.S. 357, 14 L.Ed. 2d 443, 85 S.Ct. 1498 (1965). The broad language of the statute indicates that the scope of its concept and application is not limited to precise acts and practices which can be readily catalogued. *Pan American World Airways, Inc. v. United States,* 371 U.S. 296, 9 L.Ed. 2d 325, 83 S.Ct. 476 (1963). What is an unfair or deceptive trade practice usually depends upon the

facts of each case and the impact the practice has in the marketplace. *Pan American World Airways, Inc. v. United States, supra; see also Commonwealth v. DeCotis*, 366 Mass. 234, 316 N.E. 2d 748 (1974); *Hardy v. Toler, supra.*

Though we recognize that the language employed in Section 5 of the FTC Act paints with a broad brush, the outer limits of its reach have emerged in the reported cases. Before proceeding to discuss the sweep of the statutory language, we note in passing that the language contemplates two distinct grounds for relief. While an act or practice which is unfair may also be deceptive, or vice versa, it need not be so for there to be a violation of the Act.

[5]   The concept of "unfairness" is broader than and includes the concept of "deception." [1974] 2 Trade Reg. Rep. (CCH) § 7521. A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscruplous, or substantially injurious to consumers. *Spiegel, Inc. v. Federal Trade Comm'n*, 540 F. 2d 287 (7th Cir. 1976); *see Federal Trade Comm'n v. Sperry & Hutchinson Co.*, 405 U.S. 233, 31 L.Ed. 2d 170, 92 S.Ct. 898 (1972).[6]

In *Spiegel, supra,* petitioner was a Delaware corporation with its office and principal place of business in Chicago, Illinois. It was a catalogue retailer who engaged in the advertising, offering for sale, and distribution of an extensive line of consumer goods. In the course of its mail order business, petitioner received orders in Illinois from purchasers in numerous states. In order to facilitate purchase of its products, Spiegel regularly extended credit to consumers. In the course of collecting retail credit accounts, Spiegel customarily used Illinois courts to sue allegedly defaulting customers who resided outside of Illinois. In filing these collection

---

6. In *Sperry & Hutchinson*, Mr. Justice White noted that

The Commission has described the factors it considers in determining whether a practice that is neither in violation of the antitrust laws nor deceptive is nonetheless unfair:

"(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes *substantial injury to consumers* (or competitors or other businessmen)." 405 U.S. at 244-245, 31 L.Ed. 2d at 179, 92 S.Ct. at 905, n. 5.

actions, Spiegel availed itself of the Illinois long-arm statute to establish jurisdiction. In the event that the defendant raised an objection to the forum on the ground of inconvenience, Spiegel would take a voluntary dismissal.[7] The Federal Trade Commission concluded after an investigation that the practice amounted to a violation of Section 5 and entered a cease and desist order. The order provided that Spiegel was to institute collection actions only in the county of the debtor's residence or in the county where the contract was signed.

[6]   On appeal, the Seventh Circuit affirmed the conclusion of the Commission.[8] The court noted that many of Spiegel's customers lived outside of Illinois. Almost all of them had no contact with the state other than their business dealings with Spiegel, receiving its catalogues in the mail and executing the purchasing contracts in their homes. The court drew upon the opinion of the Commission, *In re Spiegel, Inc.*, 86 F.T.C. 425 (1975), to observe that the practice was offensive to articulated public policy to guarantee all citizens a meaningful opportunity to defend themselves in court. By using the Circuit Court of Cook County, Spiegel forced the consumer to appear in a courtroom hundreds or even thousands of miles from home, at a cost in travel alone that may have exceeded the amount in controversy. Even if the judgments obtained against the debtor were set aside, affirmative efforts to procure such action would be costly and burdensome to the consumer. The Commission and the Seventh Circuit were sensitive to the fact that improper judgments could be put to injurious uses such as the sullying of credit records. Though the factors which the Federal Trade Commission considers in making a determination of whether a practice is unfair are of necessity broad, the application they received by the Seventh Circuit in *Spiegel* reveals their essence: A party is guilty of an unfair act or practice when it engages in conduct which amounts to an inequitable assertion of its power or position. *Spiegel, Inc. v. Federal Trade Comm'n*, 540 F. 2d at 294; *cf. Federal Trade Comm'n v. Sperry & Hutchinson Co.*, 405 U.S. at 244, 31 L.Ed. 2d at 179, 92 S.Ct. at 905. (". . . the Federal Trade Commission does not ar-

---

7. Spiegel ceased the practice in February 1973, before the order of the Commission.

8. The Seventh Circuit modified the order of the Commission as to particulars which are not now relevant.

rogate excessive power to itself if, in measuring a practice against the elusive, but congressionally mandated standard of fairness, it, like a court of equity, considers public values beyond simply those enshrined in the letter or encompassed in the spirit of the antitrust laws.")

[7] The record is devoid of any evidence which would tend to show that Cameron-Brown engaged in any conduct which would be unfair when judged in light of the principles we have enunciated above. At all times, Cameron-Brown was cooperative, doing what it could as an intermediary with Phoenix so as to secure for the partnership the terms and modifications it desired to have. As a result of Cameron-Brown's efforts, there was no difficulty posed in obtaining the consent of Phoenix for the substitution of tenants. The evidence shows without contradiction that the partnership had continuing problems securing tenants for the shopping center. There is no evidence whatsoever that Cameron-Brown exerted itself in any manner which would have contributed to the problem of securing tenants. Nor is there any evidence that Cameron-Brown had anything to do with NCNB's withdrawing from the project as the construction lender.

Having dealt with the concept of unfairness, we now turn our attention to the idea of deception.

[8] An act or practice is deceptive under Section 5 if it has the capacity or tendency to deceive. *Regina Corp. v. Federal Trade Comm'n*, 322 F. 2d 765 (3d Cir. 1963); *United States Retail Credit Ass'n v. Federal Trade Comm'n*, 300 F. 2d 212 (4th Cir. 1962); *Goodman v. Federal Trade Comm'n*, 244 F. 2d 584 (9th Cir. 1957); *Charles of the Ritz Distributors Corp. v. Federal Trade Comm'n*, 143 F. 2d 676 (2d Cir. 1944); *Federal Trade Comm'n v. Hires Turner Glass Co.*, 81 F. 2d 362 (3d Cir. 1935). Proof of actual deception is unnecessary. *Trans World Accounts, Inc. v. Federal Trade Comm'n*, 594 F. 2d 212 (9th Cir. 1979); *Resort Car Rental System, Inc. v. Federal Trade Comm'n*, 518 F. 2d 962 (9th Cir.), cert. denied sub. nom., *MacKenzie v. United States*, 423 U.S. 827 (1975). Though words and sentences may be framed so that they are literally true, they may still be deceptive. *Koch v. Federal Trade Comm'n*, 206 F. 2d 311 (6th Cir. 1953); see *Federal Trade Comm'n v. Sterling Drug*, 317 F. 2d 669 (2d Cir. 1963). In determining whether a representation is deceptive, its effect on the

average consumer is considered. *E.g., Aronberg v. Federal Trade Comm'n,* 132 F. 2d 165 (7th Cir. 1942).

[9]  Our examination of the record leads us to conclude that Mullins' statements were not deceptive. While Mullins' statements were truthful, we do not base our conclusion on that fact. A statement which is truthful may yet be deceptive if it has the capacity or tendency to deceive. Nothing in the record supports the view that Mullins' statements possessed this characteristic. At all times, Cameron-Brown undertook to keep the partnership accurately and clearly informed of the state of affairs concerning the loan commitment from Phoenix. There is no evidence that such was not the case or the effect.

We, therefore, conclude that the trial court did not err in granting Cameron-Brown's motion for summary judgment as to the claim for relief which alleged an unfair and deceptive trade practice.

[10]  Plaintiffs in their third claim for relief, allege that Cameron-Brown contracted to obtain permanent financing for the partnership upon certain terms and conditions, and since financing was never obtained, Cameron-Brown should refund its placement fee of $13,000.00. We disagree.

The undisputed facts establish that KVC entered into a written contract with Cameron-Brown on 9 May 1973. Under the terms of this contract, Cameron-Brown was granted the exclusive right to negotiate a permanent loan commitment for the partnership. Cameron-Brown had no other obligation towards plaintiffs. It is uncontroverted that Cameron-Brown did obtain a mortgage loan commitment for the partnership with Phoenix, which was accepted in a revised fashion on 30 August 1973. Having obtained a loan commitment from Phoenix which was accepted by KVC, Cameron-Brown earned its fee under the terms of the contract.

We hold that defendant Cameron-Brown is entitled to summary judgment as to each of plaintiffs' claims for relief.

The decision of the Court of Appeals is

Reversed.