**In re Lawrence Gray KITTRELL, Debtor.**

**Elisabeth S. PETERSEN, Trustee in Bankruptcy for Lawrence Gray Kittrell, Plaintiff,**

v.

**STATE EMPLOYEES CREDIT UNION, Defendant.**

Bankruptcy No. B–88–00956 C–7, Adv. P. No. A–88–0288.

United States Bankruptcy Court, M.D. North Carolina.

May 31, 1990.

874

Elisabeth S. Petersen, Durham, N.C., trustee.

Susan Barco, Durham, N.C., for the trustee.

William L. Yaeger and Joseph Anthony, Durham, N.C., for State Employees' Credit Union.

## MEMORANDUM OPINION

JERRY G. TART, Bankruptcy Judge.

THIS MATTER came on for trial on February 26, 1990 upon the complaint of the trustee to avoid a preferential transfer and setoff pursuant to 11 U.S.C. §§ 547, 545 and 553, and seeking treble damages and attorney fees for unfair and deceptive trade practices pursuant to N.C.Gen.Stat. §§ 75–1.1, 75–16, and 75–16.1. Elisabeth S. Petersen and Susan Barco appeared as counsel for the bankruptcy trustee and William Yeager and Joseph Anthony appeared as counsel for State Employees Credit Union. The court has carefully considered the deposition excerpts and other exhibits presented at the trial, the testimony presented at trial, arguments of counsel, the briefs and other documents in the official court file and, having taken the matter under advisement, finds that the setoff of the debtor's share account by the State Employees' Credit Union on February 26, 1988 is avoidable as a matter of bankruptcy law under 11 U.S.C. §§ 545, 547(b), and 553, and further finds that certain acts and practices of the State Employees' Credit Union, including the setoff in question, constitute unfair and deceptive trade practices under N.C.Gen.Stat. §§ 75–1.1, 75–16, and 75–16.1.

## FACTS

The debtor, Lawrence G. Kittrell, filed a voluntary petition under Chapter 7 of the United States Bankruptcy Code on May 2, 1988, and Elisabeth S. Petersen was appointed trustee of the debtor's estate. In the present case, the trustee seeks to recover from the State Employees' Credit Union (SECU) the sum of $8,506.80, which was withdrawn from the debtor's share account by SECU within the 90 day period preceding the filing of the Chapter 7 petition in this case. The trustee contends that the withdrawal constituted either a preference under 11 U.S.C. § 547(b) or an avoidable setoff under 11 U.S.C. § 553, or both. The trustee further contends that the actions of SECU leading up to the withdrawal of funds constitute unfair and deceptive trade practices which injured the debtor and entitle the trustee to recover, for the benefit of the debtor's estate, treble damages and attorney's fees. SECU contends that it did not engage in any unfair or deceptive trade practices, that the debtor voluntarily paid off the loan, that if the "payoff" was actually a setoff, it was protected by 11 U.S.C. § 553, and that it was fully secured as a result of a statutory lien imposed under N.C.Gen.Stat. § 54–109.59, and therefore received no preferential transfer under 11 U.S.C. § 547(b). The dispute between the trustee and SECU is based upon the following events and circumstances.

The debtor, Lawrence G. Kittrell, was first employed as a teacher in the North Carolina school system in 1976. As a state employee, the debtor contributed to the Teachers' and State Employees' Retirement System ("Retirement System"). In 1977 the debtor became a member of the State Employees' Credit Union, a private, nonprofit association incorporated under Chapter 54 of the North Carolina General Statutes.

In 1977, the debtor obtained his first loan from SECU. As a standard procedure of the loan process, the debtor was required to sign two form letters, Form 100 and Form 102. Form 102 is addressed to the Retirement System, and reads as follows:

> You are hereby authorized and instructed to forward any checks covering benefits ... that are due me, in care of the

State Employees' Credit Union, P.O. Box 26927, Raleigh, North Carolina 27611.

I am aware that such benefits will be made payable only to me, are unassignable, and exempt from levy, sale, garnishment, or attachment. Should I at any time desire to change this authorization, you shall be so notified by me in writing through the above named organization.

Form 100 is addressed to SECU, and states:

The Retirement System, of which I am a member, has been authorized to send any benefit check or checks as they may become due direct to your office for deposit to my credit. I have also advised them that any change rescinding that order will be filed through our Credit Union. You are instructed to deposit any such payments forwarded by the ... Retirement System to my share account except that, should I be obligated to the Credit Union for a loan when such payment or payments are received, then the loan account is to be credited and any difference credited to the share account.

When the debtor signed Forms 100 and 102 in 1977, the loan officer did not explain to the debtor how SECU used the forms. Although he obtained a number of other loans from SECU between 1977 and 1985, the debtor did not execute new Forms 100 and 102 with the subsequent loans. The 1977 Forms 100 and 102 were not seen again by the debtor until after he filed bankruptcy in 1988.

In April, 1985, the debtor obtained two "open end" loan advances from SECU. In obtaining the advances, the debtor signed several documents, including a "Truth in Lending Disclosure Statement and Agreement" ("Disclosure Statement"), an "Open End Loan Advance Request and Disclosure" ("Advance Request") dated April 4, 1985, and a second "Open End Loan Advance Request and Disclosure" dated April 11, 1985. Both Advance Request forms indicate that the loans requested are secured by "other collateral" as indicated on the Disclosure Statement. On the front of the Disclosure Statement the block for "other" collateral is marked, and beside it is written the description: "Retirement/Salary". The April 11 Advance Request adds a 1983 Buick Skylark, valued by SECU at $4,475.00, to the "other" collateral as security for the loan requested. The total debt "secured" by the Buick and the "other" collateral was $14,454.00. The debtor's payments on the loan were made by payroll deduction.

In October, 1987, the debtor terminated his employment with the state. The debtor subsequently missed the December 1, 1987, January 1, 1988, and February 1, 1988 payments on his loan with SECU. Concerned about having his automobile repossessed by SECU, the debtor contacted SECU and was told that he should go to a SECU branch office for help in completing a State Retirement System Form 5, Application for Refund of Retirement Contribution ("Form 5"). After the debtor filled in the employee's portion of the Form 5, a SECU employee notarized the form, and the debtor took the form to his former employer for completion. Upon receipt of the Form 5, the Retirement System checked the magnetic tape that it receives weekly from SECU for the debtor's name. The magnetic tape contains a list of all SECU members with completed Forms 102 and outstanding loan balances. Upon finding the debtor's name on the list from SECU, the Retirement System issued the debtor's refund check to the debtor in care of SECU, and sent it directly to SECU.

On February 25, 1988, SECU received the debtor's retirement refund check and credited the debtor's share account with a deposit of $12,126.71. On February 26, 1988, SECU accelerated the debtor's outstanding loan, withdrew $8,506.80 from the debtor's share account, and paid the balance due on the debtor's loan. Sometime later, SECU returned the title to the 1983 Buick to the debtor.

After the debtor filed bankruptcy on May 2, 1988, the trustee contacted SECU and demanded the return of the $8,506.80. Receiving no response from SECU, the trustee then commenced this adversary proceeding.

## DISCUSSION OF CHAPTER 75 CLAIM [1]

The trustee seeks an award of treble damages and attorney's fees pursuant to the North Carolina unfair and deceptive trade practices statute. *See* N.C.Gen.Stat. §§ 75–1.1, 75–16 and 75–16.1. Section 75–1.1 provides:

(a) Unfair methods of competition in or affecting commerce, and unfair or deceptive trade practices in or affecting commerce, are declared unlawful.

(b) For purposes of this section, "commerce" includes all business activities, however denominated, but does not include professional services rendered by a member of a learned profession.

Section 75–16 mandates treble damages for injuries resulting from violations of this section, and § 75–16.1 awards attorney's fees to a party injured by the willful violation of this section.

In order to prevail under §§ 75–1.1 and 75–16, the trustee must show that (1) the acts or practices in question are "in or affecting commerce"; (2) the acts or practices in question had the capacity or tendency to deceive or were unfair; and (3) the debtor suffered actual injury as a proximate result of the credit union's acts or practices. *See Johnson v. Phoenix Mutual Life Insurance Co.*, 300 N.C. 247, 266 S.E.2d 610 (1980); *Marshall v. Miller*, 302 N.C. 539, 276 S.E.2d 397 (1981); *Pearce v. American Defender Life Insurance Co.*, 316 N.C. 461, 343 S.E.2d 174 (1986). Unquestionably, transactions between the debtor, as borrower, and SECU, as lender, constitute acts or practices "in or affecting commerce", *see, e.g., Johnson*, 302 N.C. at 262, 266 S.E.2d 610, therefore the court will turn its attention to the remaining elements of the trustee's *prima facie* case.

Because the terms "unfair" and "deceptive" are not defined in the statute, the court must look to North Carolina case law for guidance. The North Carolina Supreme Court has stated that the broad language of the statute indicates that its scope is not limited to precise acts and practices which can be readily catalogued. *Johnson*, 300 N.C. at 262, 266 S.E.2d 610. Whether a trade practice is unfair or deceptive depends upon the facts of each case. *Id.* The intent of the defendant and good faith are irrelevant. *Marshall*, 302 N.C. at 548, 276 S.E.2d 397.

A practice is unfair when it offends public policy, as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. *Johnson*, 300 N.C. at 263, 266 S.E.2d 610. A party is guilty of an unfair act or practice when it engages in conduct which amounts to an inequitable assertion of its power or position. *Id.* at 264, 266 S.E.2d 610. An act or practice is deceptive if it has the capacity or tendency to deceive. *Id.* at 265, 266 S.E.2d 610. Words or phrases, though literally true, may still be deceptive. *Id.* In determining whether a particular act or practice is deceptive, its effect on the average consumer is considered. *Id.* at 265–66, 266 S.E.2d 610.

The trustee contends that the unfair and deceptive "practice" in this case consists of several separate practices which, collectively, not only have the tendency to deceive consumers, but also violate the public policy of this state. Specifically, those practices are as follows:

1. Inserting the word "retirement" in the "other collateral" block on its loan documents, and thereby implying an enforceable security interest in the debtor's retirement account when, in fact, no such security interest existed;

2. Using forms 100 and 102 to have the debtor's retirement refund improperly deposited with SECU so that delinquent loan amounts might be setoff by SECU, where:

a. the forms were misleading and not self-explanatory;

b. the forms were not adequately explained at the time that the debtor signed them; and

c. the forms were retained for years by SECU, but were never subsequent-

---

**1.** The court has chosen to change the normal order of the arguments in this case and address the unfair and deceptive trade practices issue first because of its impact on the bankruptcy law issues.

ly explained or offered to the debtor for his examination and ratification when new loans were made.

In North Carolina, credit unions are authorized by statute to make loans to members and to take as security for those loans "generally accepted types of security, the endorsement of ... a guarantor, and assignments of shares, in a manner consistent with the laws of this State." N.C.Gen. Stat. § 54–109.68. In the present case, the loan documents in question indicated on their face that SECU had taken a security interest in the debtor's car and "other collateral", more specifically identified as "retirement". However, the designation of "retirement" as "other collateral" is clearly misleading, since the "retirement" account of a state employee is unassignable, and therefore not available as a source of security to SECU. *See* N.C.Gen.Stat. § 135–9; *Reynolds v. N.C. State Employees Credit Union,* 31 B.R. 296 (Bankr.E.D. N.C.1983).

SECU acknowledges that N.C.Gen.Stat. § 135–9 prohibits it from taking any security interest in the debtor's retirement account. SECU claims that the word "retirement" was written in the "other" collateral block to indicate merely that the loan was an *unsecured* loan to a debtor with the ability to repay the loan with a potential future asset, i.e., his retirement *refund.* In support of this explanation, SECU points out that the fine print on the back of its loan documents indicates that "retirement" is actually "unsecured collateral". SECU argues that this language clearly explains that the loan is unsecured, and constitutes a sufficient disclosure of that status to the debtor. The court does not accept SECU's explanation, and finds that the word "retirement" inserted in the "other collateral" block on the front of the loan documents has the tendency to deceive the average borrower into thinking that SECU has a valid, enforceable security interest in the borrower's retirement account.

The court comes to this conclusion based largely on the very credible testimony of the debtor in this case, Lawrence Kittrell, whom the court considers to be an average borrower. Kittrell testified that, based on his understanding of the word "collateral", he thought that SECU had a lien on his retirement account much like the lien that it had on his car. Kittrell understood that SECU could come and "take" his car if he defaulted on his loan because his car was "collateral" for that loan. He had the same understanding when it came to his retirement account, which was likewise listed as collateral for his loan.

SECU argues that Kittrell knew or should have known that his retirement account was protected by statute from any form of levy or assignment so long as it stayed in the retirement system, and that therefore any loan based on retirement was necessarily an unsecured loan. In support of this argument, SECU points out that in 1977 the debtor signed Form 102, which contains the statement: "I am aware that such benefits are ... unassignable, and exempt from levy, sale, garnishment, or attachment." SECU implies by this argument that (1) its documents were truthful, and therefore were not in fact deceptive, and (2) Kittrell was not actually deceived by the documents. The court notes that pursuant to North Carolina case law, even truthful statements can be deceptive, and accordingly does not address that aspect of SECU's argument. *See Johnson,* 300 N.C. at 265, 266 S.E.2d 610. However, the question of whether or not the debtor was actually deceived by SECU's acts or practices is critical to the trustee's case, and merits careful consideration from the court.

The evidence presented indicates that, as was its practice, SECU had the debtor sign Form 102 (and its companion, Form 100), without explanation when he obtained his first loan in 1977. SECU retained the 1977 Forms 102 and 100 permanently, although all other loan documents were destroyed when the debtor's 1977 loan was paid off. When the debtor obtained the 1985 loan from SECU, the 1977 Form 102 was not shown to the debtor, discussed with the debtor, ratified by the debtor, or replaced with a new Form 102. Naturally, where a member has obtained several different loans over a period of years, he would tend to forget about the original Form 102 which he had signed, or tend to think that it had applied only to the first loan. In the

present case, the debtor testified that he had forgotten what the 1977 Form 102 said by the time he obtained the 1985 loan from SECU, that he did not understand the significance of the statutory language in Form 102, and that he thought that SECU had a lien on his retirement account because of the insertion of the word "retirement" in the "other collateral" block on the loan documents.

Having considered all of the above evidence, the court finds that the debtor was in fact deceived by the loan documents in question into believing that SECU had a security interest in his retirement account. The fact that the debtor signed a Form 102 in 1977 is not sufficient evidence of knowledge of the statutory protection of state employees' retirement accounts to negate that finding. The court further finds that deceiving the debtor about the true nature of his loan was only one part of a scheme designed or calculated by SECU to circumvent the statutory prohibition against assignment of retirement benefits.

It is obvious to this court that SECU looked to the debtor's retirement fund as a potential source of repayment of its loan. The balances in the retirement funds of *all* state employees (even those who were not members of SECU) were sent to SECU annually by the Retirement System. SECU admits that it considers the size of a member's retirement fund when calculating his loan eligibility, especially on unsecured loans. Unsecured loans are generally paid by payroll deduction, and consequently, SECU has little, if any, difficulty collecting on those loans so long as the debtor stays employed. However, once a debtor becomes unemployed, SECU becomes just as vulnerable as any other unsecured creditor *unless* the debtor has sufficient funds in his share account for SECU to setoff the balance due on its loan. It is to this end that SECU has devised a very subtle and effective scheme for getting unemployed debtors' retirement refunds deposited to their share accounts.

An unemployed state employee is entitled to leave his retirement account in the system or to request a refund of that account. Once a retirement refund is requested, the statutory prohibitions against attachment, levy and assignment no longer apply. Thus, a retirement refund, once deposited in a debtor's share account, would be subject to setoff just like any other funds of the debtor. The key, of course, is getting the retirement refund into the debtor's share account. SECU admits that if all debtors who terminated their state employment received their refunds directly from the Retirement System, SECU would have a difficult time collecting on its outstanding loans. To prevent such a contingency, SECU has an "agreement" with the Retirement System, whereby SECU supplies the Retirement System on a weekly basis with a magnetic tape listing all SECU debtors with a completed Form 102 and an outstanding loan. The Retirement System checks every refund request against SECU's list of debtors, and, upon finding a match, issues the debtor's refund check "in care of" SECU and sends the check directly to SECU. SECU deposits the debtor's refund check in his share account and then offsets the balance due on the debtor's loan. This practice, which virtually guarantees that every retirement refund of every debtor with an outstanding loan balance goes directly to SECU, depends upon the debtor's willingness to sign Forms 100 and 102, the debtor's willingness to request his refund, and the debtor's failure to rescind Forms 100 and 102 before his retirement refund is requested. To insure that debtors will sign the necessary forms and make the necessary request without questioning the resulting setoff, SECU has adopted certain practices which this court finds to be deceptive.

SECU routinely requires borrowers to sign Forms 100 and 102 as part of the loan process for what would otherwise be an unsecured loan. Form 102, which authorizes the Retirement System to send the borrower's retirement refund to SECU, implies that such authorization can only be rescinded by the borrower through SECU, when in fact such authorization can be rescinded at any time by direct communication from the borrower. Form 100, which authorizes SECU to deposit the borrower's retirement refund and pay his outstanding loans with SECU, implies a promise by the

borrower to have his retirement refund sent directly to SECU. The evidence presented indicated that SECU doesn't explain these forms to the borrower at the time that they are signed, but simply describes each form with a brief sentence as the borrower is directed to sign it. Unlike its other loan documents, SECU does not give copies of Forms 100 and 102 to the borrower. Although SECU admits that Forms 100 and 102 are very important loan documents, SECU has a practice of permanently filing these forms away and *never* showing them to the borrower again. It appears to the court that SECU deliberately hides Forms 100 and 102 from borrowers to keep them from questioning the forms and its practices.

SECU has other subtly deceptive ways of insuring that debtors don't question its practices and, subsequently, don't rescind the all-important Forms 100 and 102. The loan documents list "retirement" as "other collateral", and thereby imply that SECU has a security interest in, and is entitled to receive, the borrower's retirement refund. SECU's employees are instructed to solicit retirement refunds from terminated borrowers, and even assist them with the necessary paperwork, but not to inform the borrower that his refund will come directly to SECU, or that he will only receive the balance, if any, of his refund after SECU offsets any outstanding loan balance.

SECU claims that the trustee has completely mischaracterized its Forms 100 and 102. First, SECU argues that the debtor's 1977 Form 100 instructed SECU to "pay off" the debtor's loan in 1988 when SECU received the debtor's retirement refund check, and therefore the "payoff" was made pursuant to its contract with the debtor and at his request. The court is unwilling to find that "instructions" given by form letter signed in 1977 are applicable to a loan "payoff" in 1988, where there have been several intervening loans, and where the borrower has never re-examined or ratified the 1977 form. The purported "payoff" in this case was in fact a setoff, not a voluntary payment by the debtor. SECU also argues that Form 102 is merely a "change of address" form, and not a tool for acquiring the debtor's retirement re-

fund as the trustee asserts. The court finds the argument that the debtor signed a "change of address" form years ahead of the date on which it was used to be completely ludicrous. The court examined SECU's witnesses as to the character and use of Forms 100 and 102, and found SECU's witnesses to be evasive and their explanations implausible. Having carefully reviewed all of the evidence presented, the court is of the opinion that SECU, fully aware of the statutory prohibitions on the assignment of state employees' retirement accounts, deliberately and intentionally set about to create a "scheme" for circumventing that prohibition.

Furthermore, this court is of the opinion that the trade practices of SECU described herein are unfair as well as deceptive in that the practices offend public policy, specifically, the public policy codified in the Teachers and State Employees' Retirement Act ("Retirement Act") and the exemption provisions of N.C.Gen.Stat. § 135–9. The general purpose of the Retirement Act is to provide benefits upon retirement to teachers and other state employees. *Bridges v. City of Charlotte*, 221 N.C. 472, 20 S.E.2d 825 (1942). One objective of the Retirement Act is to improve standards of service and stabilize teacher employment by providing some measure of freedom from apprehension of old age and disability. *Id.* The exemption provisions of N.C.Gen.Stat. § 135–9 echo that policy by providing that the retirement funds of teachers and state employees are exempt from attachment, garnishment, levy and assignment. Yet, with the assistance and cooperation of the Retirement System, and by means of half-truths, form letters, and setoff, SECU has been able to accomplish what the state legislature has strictly prohibited: it has created a *de facto* assignment of, and means of attaching, the retirement funds of state employees who default on what would otherwise be unsecured loans.

The evidence presented indicated that SECU has adopted the trade practices herein described as part of its official policy, and that it followed that policy in making and collecting the Kittrell loan. The evidence further indicated that the debtor was

in fact deceived by SECU's practices into believing that:

1) SECU was entitled to receive his retirement refund and apply it to his loan balance because he had pledged his "retirement" as "collateral"; and that

2) he was required to request his retirement refund through SECU, and was not entitled to have it sent directly to him at his residence.

This court finds that the practices and actions of SECU herein described violate the public policy of protecting the retirement accounts of teachers and other state employees, have the tendency to deceive borrowers regarding their rights to their retirement accounts, and collectively constitute unfair and deceptive trade practices. The debtor was deceived and damaged as a result of SECU's unfair and deceptive trade practices in that he lost the ability to use his retirement refund for his own needs, including his eventual retirement. The trustee is entitled to recover treble damages for the benefit of the debtor's estate pursuant to N.C.Gen.Stat. § 75–16 and 11 U.S.C. §§ 323 and 541. The actual damages equal the amount of the offset, $8,508.80, less the $2,500.00 stipulated value of the automobile which served as collateral for debtor's loan. This court further finds that the evidence as herein recited indicates that SECU knowingly and willfully engaged in unfair and deceptive trade practices, and therefore the trustee is entitled to recover attorney's fees pursuant to N.C.Gen.Stat. § 75–16.1. A separate hearing will be set to determine the amount of attorney's fees allowable in this matter.

## DISCUSSION OF THE BANKRUPTCY CLAIMS

The trustee contends that even if SECU's prepetition setoff of the debtor's share account cannot be recovered under North Carolina's unfair and deceptive trade practices statutes, the setoff can be recovered for the debtor's estate either as a preference, under 11 U.S.C. § 547, or as an impermissible setoff under 11 U.S.C. § 553. The Fourth Circuit Court of Appeals recently provided the following guidance as to the order in which we should consider the trustee's bankruptcy claims:

Where a pre-petition setoff is asserted in defense to a proceeding brought by a trustee the court must first determine whether the setoff is valid under section 553. Only if the court finds the setoff invalid, and further concludes that no right of setoff exists in bankruptcy, is section 547 applied.

*Durham v. SMI Industries Corporation,* 882 F.2d 881 (4th Cir.1989). Accordingly, this court will first consider whether SECU's pre-petition setoff was valid under § 553 of the Bankruptcy Code.

### A. Setoff Under 11 U.S.C. § 553

Section 553 of the Bankruptcy Code preserves any right of setoff accorded by state law, subject to certain limitations, but does not create a right of setoff where none exists. *Durham,* 882 F.2d at 883. In North Carolina, a credit union, like a bank, has the common law right to setoff deposits in the accounts of its shareholders against their delinquent debts. The Bankruptcy Code does not alter a credit union's right of setoff unless one of the exceptions to § 553(a) applies. In the present case, the trustee argues, and the court agrees, that § 553(a)(3) applies to the setoff in question and removes it from the general protection of § 553(a).

Section 553(a)(3) is triggered when: (3) the debt owed to the debtor by such creditor was incurred by such creditor—

(A) after 90 days before the date of the filing of the petition:

(B) while the debtor was insolvent: and

(C) for the purpose of obtaining a right of setoff against the debtor.

In other words, the setoff exception of § 553(a) does not apply where a deposit is accepted or obtained by a credit union with the intent of applying it to a pre-existing claim against the depositor. *See Matter of Dutton,* 15 B.R. 318, 321 (Bankr.D.N.J. 1981) *citing In re PRS Products, Inc.,* 574 F.2d 414 (8th Cir.1978). In contrast, where a credit union can show that its right to setoff derives from a deposit made in good faith, made in the due course of business, and subject to withdrawal at the will of the

depositor, the setoff is not subject to avoidance under the Bankruptcy Code. *Id.*

In the present case, the evidence presented indicated that SECU engineered the deposit of the debtor's refund check by means of its unfair and deceptive trade practices and its "agreement" with the Retirement System, and that SECU did not receive and deposit the debtor's refund check in good faith or in the ordinary course of business. The evidence also indicated that immediately after it deposited the debtor's refund check, SECU put a "hold" on the debtor's share account, thereby limiting the debtor's ability to withdraw his deposited refund until after SECU had completed its setoff. Clearly, SECU acquired and deposited the debtor's retirement refund to his share account for the purpose of applying the funds to the debtor's delinquent loan. The setoff occurred within the 90 day period preceding the filing of the bankruptcy petition, during which the debtor is presumed to have been insolvent. *See* 11 U.S.C. § 553(c). Therefore, the court finds that the setoff falls within the exception created by § 553(a)(3) and is subject to avoidance under the Bankruptcy Code.

### B. Avoidable Preference Under 11 U.S.C. § 547

Having determined that the setoff in question was invalid and subject to avoidance under bankruptcy law, the court now turns to the question of whether the setoff constitutes a preferential transfer. Section 547(b) of the Bankruptcy Code provides that a trustee may avoid, and proceed to seek recovery of, any transfer made by a debtor to a creditor within 90 days prior to filing for bankruptcy that has the effect of enabling that creditor to receive more than it would in the bankruptcy proceeding had the transfer not been made. *Durham,* 882 F.2d at 882; 11 U.S.C. § 547(b). The Bankruptcy Code defines a "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property." 11 U.S.C. § 101(50). A setoff not otherwise protected by the Bankruptcy Code is recoverable as a preferential transfer. *Durham,* 882 F.2d at 882.

SECU argues that the setoff in question is not avoidable because the loan was fully secured, and therefore it did not receive more than it would have received in the debtor's bankruptcy proceeding. SECU asserts that it was secured either as a result of its right to setoff, or as a result of the fixing of a statutory lien. Although the fixing of the statutory lien occurred within the 90 day preference period, SECU asserts that the fixing of the lien is excepted from avoidance by 11 U.S.C. § 547(c)(6). The trustee argues, and the court agrees, that the statutory lien is avoidable under 11 U.S.C. § 545, that the fixing of the lien is avoidable under 11 U.S.C. § 547(b), and that the setoff is avoidable under 11 U.S.C. § 547(b) to the extent that SECU received more than it would have received in the bankruptcy proceeding.

SECU correctly argues that payments to a fully secured creditor are not preferential transfers. The question is whether, and to what extent, SECU was secured. SECU claims that it became fully secured when it asserted a statutory lien on the debtor's share account under N.C. Gen.Stat. § 54–109.59, which provides:

> The credit union shall have a lien on the shares, deposits and accumulated dividends or interest of the member in his individual, joint or trust account, for any sum past due the credit union from said member or for any loan endorsed by him.

Although there are no cases directly on point, the court is of the opinion that SECU was not entitled to assert a statutory lien under N.C.Gen.Stat. § 54–109.59 on the funds in the debtor's share account because those funds were deposited in the debtor's share account as a result of SECU's unfair and deceptive trade practices. Under common law, no person can acquire a lien founded on his own illegal or fraudulent act. *See* 51 Am Jur 2d *Liens* § 21 at 159.

However, regardless of whether or not SECU is entitled to the benefits of a statutory lien under state law, the statutory lien created by N.C.Gen.Stat. § 54–109.59 is avoidable under federal bankruptcy law. State created statutory

liens are generally intended to give various classes of what would otherwise be unsecured creditors some sort of priority status. The Bankruptcy Code permits the trustee to avoid the fixing of certain types of statutory liens, including those that first become effective against the debtor when the debtor's financial condition fails to meet a specified standard. 11 U.S.C. § 545(1)(E). Under N.C.Gen.Stat. § 54–109.59 a credit union has a lien on a member's share account for "sums past due the credit union from [a] member." It appears to the court that the lien created by N.C.Gen.Stat. § 54–109.59 becomes effective against a debtor only when the debtor's financial condition fails to meet a specified financial standard, i.e., when the debtor is "past due" with his payments to the credit union. It further appears to the court that if in fact SECU had a valid statutory lien on the debtor's share account pursuant to N.C. Gen.Stat. § 54–109.59, then the trustee can avoid that lien pursuant to 11 U.S.C. §§ 545(1)(E) and 547(b).

SECU next contends that it was secured at the time of the setoff in question by its very right to setoff, and points to Bankruptcy Code § 506(a) as support for its argument. Section 506(a) provides that "an allowed claim ... subject to setoff under section 553 ... is a secured claim ... to the extent of the amount subject to setoff." The court notes that in the present case SECU has asserted its right to setoff as a *defense,* and not as a basis for a secured claim. Accordingly, the court finds that § 506(a) is inapplicable to the present case and that SECU was not "secured" by its right to setoff for purposes of defending against a preference action by the trustee. *See Durham,* 882 F.2d at 883.

Although SECU was not fully secured at the time of the setoff in question, the trustee acknowledges that SECU did hold a valid security interest in the debtor's automobile and was at least partially secured. The parties have stipulated that the automobile which secured the debtor's loan with SECU had a value of $2,500.00 at the time of the setoff. Therefore, the amount of the preferential transfer received by SECU in the present case is the amount of the setoff, $8,508.80, less the value of the automobile, $2,500.00, or $6,008.80.

## CONCLUSION

This court finds that the lending and collection practices of the State Employees' Credit Union described in this opinion collectively constitute unfair and deceptive trade practices pursuant to N.C.Gen.Stat. § 75–1.1. In addition, the court finds that the State Employees' Credit Union willfully engaged in unfair and deceptive trade practices, and that the debtor, Lawrence G. Kittrell, was deceived and damaged as a result thereof in the amount of $6,008.80. The trustee, as the successor in interest of the debtor's claims against the State Employees' Credit union is therefore entitled to recover treble damages and attorneys' fees pursuant to N.C.Gen.Stat. §§ 75–16 and 75–16.1 on behalf of the debtor's estate.

This court further finds that the setoff of the debtor's loan balance by the State Employees' Credit Union on February 26, 1988 was not protected by 11 U.S.C. §§ 547(c)(6) or 553, and constituted an avoidable preference pursuant to 11 U.S.C. § 547(b) in the amount of $6,008.80.