TOMLIN v. DYLAN MORTGAGE INC., 2000 NCBC 9

| | | |
|---|---|---|
| STATE OF NORTH CAROLINA | ) | IN THE GENERAL COURT OF JUSTICE SUPERIOR COURT DIVISION |
| COUNTY OF NEW HANOVER | ) | 99 CVS 3551 |

STATE OF NORTH CAROLINA ) IN THE GENERAL COURT OF JUSTICE

COUNTY OF NEW HANOVER )

)
)

JANICE H. TOMLIN and ISAIAH TOMLIN, )
and CONSTANCE A. WIGGINS, on behalf of )
themselves and all others similarly situated, )

)

     Plaintiffs, )

)

        vs. )

)

DYLAN MORTGAGE INCORPORATED ) **ORDER AND OPINION**
(formerly known as Chase Mortgage Brokers, )
Inc.), HOMEGOLD, INC. (formerly known as )
Emergent Mortgage Corp.), ASSOCIATES )
FINANCIAL SERVICES OF AMERICA, INC., )
and EQUICREDIT CORPORATION OF )
AMERICA, )

     Defendants.

{1}    This matter comes before the Court on defendants' motions to dismiss pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. The motions to dismiss raise several issues. First, to what extent is the written agreement between two of the defendants a bar to plaintiffs' claims? Second, does a mortgage broker owe a fiduciary duty to borrowers? Third, do plaintiffs have a claim for excessive fees under Chapter 24 of the North Carolina General Statutes? Finally, is the imposition of assignee liability proper in this case? Based upon the answers to these questions discussed below, this Court finds that the Complaint does state a cause of action against all defendants. With the exception of the Court's decision to dismiss plaintiffs' unjust enrichment claim, the motions to dismiss are denied.

*Hartzell & Whiteman, LLP, by J. Jerome Hartzell; Morgan & Maynard, PLLC, by Mallam J. Maynard; Gulley & Calhoun, by Michael D. Calhoun; Patterson, Harkavy & Lawrence, LLP, by Melinda Lawrence; North Carolina Justice & Community Development Center, by Carlene McNulty, for Plaintiffs.*

*Hunton & Williams, by Frank A. Hirsch, Jr., Matthew P. McGuire and Heather Bell Adams, for Defendant HomeGold, Inc.*

*Robinson Bradshaw & Hinson, P.A., by Frank E. Emory, Jr., Robert E. Harrington and Anthony S. Ketron, for Defendant Associates Financial Services of America, Inc.*

*Kennedy, Covington, Lobdell & Hickman, LLP, by John H. Culver, III and Amy Pritchard Williams, for Defendant EquiCredit Corporation of America.*

**I.**

{2} For the purposes of this motion, the following facts, which were alleged in plaintiffs' complaint, are taken as true.

{3} Plaintiffs Janice and Isaiah Tomlin and Constance Wiggins contacted Chase Mortgage Brokers (now Dylan Mortgage, Inc. or "Dylan") to assist them in finding a new loan to refinance their home mortgages. Plaintiffs entered into a written Broker Agreement with Dylan, which granted Dylan the exclusive right for ninety days to assist plaintiffs in either obtaining a new loan or refinancing a current one.

{4} At the time plaintiffs entered into the Broker Agreement with Dylan, Dylan and Emergent Mortgage Corporation (now HomeGold, Inc. or "HomeGold") were parties to a contract (the "Agreement")[fn1] whereby Dylan would originate loans for which HomeGold would provide Dylan the funds. Following assignment of the Dylan-originated loans to HomeGold, HomeGold would attempt to sell or to securitize the loans. HomeGold and Dylan agreed to share equally the profits and losses realized from any such sales or securitizations.

{5} On March 30, 1998, the Tomlins signed a deed of trust on their home to secure a loan in the total amount of $55,120, which included $6,179 in fees paid to Dylan or HomeGold in connection with the closing. On September 17, 1998, Ms. Wiggins signed a note and deed of trust to secure a loan of $28,000, which included $3,521 in fees paid to Dylan or HomeGold. Dylan obtained the funds for plaintiffs' loans from HomeGold, and plaintiffs' loans were assigned to HomeGold at closing. HomeGold subsequently sold the Tomlins' loan to Associates Financial Services of America, Inc. ("Associates"), while Ms. Wiggins' loan subsequently was sold to EquiCredit Corporation of America ("EquiCredit"). A breakdown of the fees charged to the Tomlins and Ms. Wiggins is as follows:

| Fees | Tomlins | Wiggins |
|---|---|---|
| Underwriting fee to Dylan | $175 | $175 |
| Processing fee to Dylan | $200 | $200 |
| Appraisal review fee to Dylan | $25 | $25 |
| Document preparation fee to Dylan | $175 | $175 |
| Tax service fee to HomeGold | $61 | $61 |
| Flood certificate fee to HomeGold | $16 | $16 |
| Loan origination fee to Dylan | $5,512 | $2,800 |

Dylan has filed a petition in bankruptcy.

## II.

{6}     Plaintiffs assert the following claims against defendants:  (1) unfair trade practices in connection with premiums or kickbacks paid to Dylan by HomeGold, (2) unfair trade practices based on a failure to disclose, (3) unfair trade practices in connection with excessive fees, (4) unjust enrichment, (5) usury based on a violation of Chapter 24 of the North Carolina General Statutes, (6) breach of duty of loyalty, (7) unfair trade practices in connection with the alleged breach of duty of loyalty, and (8) injunctive relief.  The claims in this case generally fall into three categories.  First, plaintiffs claim that the loans in this case arose out of an enterprise between Dylan and HomeGold and that several aspects of the operation of the enterprise violated the state prohibition against unfair and deceptive trade practices.  Second,  plaintiffs have claimed that the conduct of Dylan and of HomeGold breached the fiduciary duty owed to the plaintiffs.  Third, plaintiffs have alleged that the fees charged in connection with the loans were illegal.  Finally, plaintiffs argue that the current holders of mortgages originated by Dylan and HomeGold cannot escape liability for the wrongs committed by Dylan and HomeGold.

{7}     Defendants have moved to dismiss all of plaintiffs' claims.  In support of their motion to dismiss, defendants argue that plaintiffs' claims may not properly be based upon the Agreement between Dylan and HomeGold.  Defendants also argue that Dylan was not in a fiduciary relationship with the plaintiffs and that therefore the claims based upon breach of fiduciary duty are improper.  Defendants further argue that the fees charged to the plaintiffs in this case were not illegal or even excessive.  Finally, defendants argue that there is no basis for imposing Dylan's alleged liability upon Associates and EquiCredit, the assignees of the loans.

{8}     When ruling on a motion to dismiss under Rule 12(b)(6), the court must determine "whether, as a matter of law, the allegations of the complaint . . . are sufficient to state a claim upon which relief may be granted."  *Harris v. NCNB*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987).  In ruling on a motion to dismiss, the court must treat the allegations in the complaint as true.  *See Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 473 S.E.2d 680, 682 (1996).  The court must construe the complaint liberally and must not dismiss the complaint unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim.  *See id.*

## A.

{9}     Defendants argue that plaintiffs failed to allege a valid claim for unfair or deceptive trade practices relating to the operation of the Agreement between Dylan and HomeGold.  Plaintiffs assert four separate claims for unfair or deceptive trade practices, all arising from the alleged enterprise between Dylan and HomeGold.  The law of North Carolina prohibits "unfair or deceptive trade practices in or

affecting commerce." N.C.G.S. § 75-1.1 (1999). In order to establish a claim for unfair or deceptive trade practices, plaintiffs must show that: (1) an unfair or deceptive act or practice has been committed for which HomeGold is liable, (2) the act in question was in or affecting commerce, and (3) the act proximately caused injury to plaintiffs. *See Pleasant Valley Promenade v. Lechmere, Inc.* , 120 N.C. App. 650, 464 S.E.2d 41 (1995). In 1980, the Supreme Court of North Carolina construed the term "unfair": "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Johnson v. Phoenix Mutual Life Ins. Co.*, 300 N.C. 247, 263, 266 S.E.2d 610, 621 (1980). The following year, the Supreme Court of North Carolina held that "a practice is deceptive if it has the capacity or tendency to deceive"; neither actual deception nor intent to deceive is required. *Marshall v. Miller*, 302 N.C. 533, 276 S.E.2d 397, 403 (1981). Furthermore, "[w]hat is an unfair or deceptive trade practice usually depends upon the facts of each case and the impact the practice has in the marketplace." *Johnson*, 300 N.C. at 262-263, 266 S.E.2d at 621.

{10} Plaintiffs' first claim for relief alleges that pursuant to the Agreement, Dylan received from HomeGold payments of premiums for placing Dylan's borrowers in loans with interest rates in excess of the market rate of interest for such mortgage loans. Plaintiffs further allege that the operation of this Agreement, specifically the payment of premiums for placing borrowers in high interest rate loans, constituted an unfair and deceptive trade practice in violation of N.C.G.S. § 75-1.1. For purposes of this motion, the Court must assume that the interest rates charged to the Dylan customers whose loans were placed with HomeGold were higher than rates which Dylan could have obtained for its customers from other lenders.

{11} Defendants challenge this claim by arguing that the Agreement does not speak to the issue of the interest rate to be charged on the loans. The defendants point to Section 1 of the agreement, which provides that HomeGold is obligated to purchase from Dylan all "Qualified Mortgages" generated or underwritten by Dylan. A "Qualified Mortgage" is defined by the Agreement as "a first or second mortgage home loan which is made by [Dylan] and closed by [Dylan's] attorney in compliance with all applicable federal, state and local statutes, rules and regulations and which meets the underwriting criteria of this Agreement." (Agreement ¶ 1(a).) Defendants argue that plaintiffs cannot base a claim upon the illegality of the Agreement when the Agreement, on its face, requires compliance with all applicable laws and regulations and provides that HomeGold will not fund loans which violate any such laws.

{12} First, the Court rejects defendants' argument that the language of the Agreement precludes a claim

that the operation of the Agreement violated the law prohibiting unfair or deceptive trade practices. An agreement to act lawfully does not preclude a claim of unlawful activity. To find otherwise would effectively allow contracting parties to escape liability by including a provision requiring the parties to act in compliance with the law. Furthermore, plaintiffs do not have to rely on the language of the Agreement itself to establish liability. Indeed, plaintiffs have alleged that the *operation* of the Agreement constituted an unfair or deceptive trade practice.

{13}   Plaintiffs have pled sufficient facts to base a claim for unfair or deceptive trade practices on the operation of the Agreement between Dylan and HomeGold. Plaintiffs allege that Dylan agreed to receive premiums for placing borrowers in high interest rate loans; it agreed to deal primarily or exclusively with HomeGold and agreed to keep secret these arrangements; and it received fees from the loans funded by HomeGold that were usurious, duplicative and excessive. Plaintiffs further allege that, given the nature of Dylan's relationship with borrowers, each of the above business practices fell within Chapter 75's prohibition against unfair or deceptive acts or practices. This Court finds that the allegations, if proven to be true, could potentially support a claim under Chapter 75. Moreover, the acts alleged were "activities in commerce" as defined under Chapter 75. *See Johnson*, 300 N.C. at 261-62, 266 S.E.2d at 620 (the "relationship of borrower and mortgage broker involves [activities in commerce].")

{14}   Plaintiffs provide statutory support for their allegations of unfair trade practices. Actions under Chapter 75 may be based on violations of other statutory regulatory schemes. *See Pearce v. American Defender Life Ins. Co.*, 316 N.C. 461, 468-70, 343 S.E.2d 174, 179 (1986) (action based on violations of provisions of Chapter 58, Article 3A, regulating insurance industry); *Winston Realty Co. v. G. H. G., Inc.*, 314 N.C. 90, 97, 331 S.E.2d 677, 681 (1985) (action based on violations of provisions of Chapter 95, Article 5A, regulating personnel services). In certain situations, statutory regulatory schemes may evidence public policy. Contravention of that public policy may give rise to a claim under Chapter 75. *See Marshall v. Miller*, 302 N.C. at 548, 276 S.E.2d at 403.

{15}   First, as will be discussed further below, plaintiffs allege that the fees charged by defendants exceeded those authorized under Chapter 24 and were thus unlawful. Plaintiffs contend that this charging of unlawful fees likewise gives rise to a claim under Chapter 75. In addition, plaintiffs point to Chapter 53 of the North Carolina General Statutes which governs the activities of mortgage brokers. Specifically, N.C.G.S. § 53-238(6) prohibits mortgage brokers from "[e]ngaging in any transaction, practice, or course of business which is not in good faith or fair dealing . . . ." Plaintiffs have alleged that Dylan was acting as a mortgage broker, and that the very nature of the relationship

between Dylan and HomeGold provided incentive to Dylan to breach its duty to plaintiffs. Plaintiffs further contend that, pursuant to the Agreement, defendants engaged in what amounted to a kickback scheme, failed to disclose the nature of their relationship and charged excessive fees, all in violation of the duty created by N.C.G.S. § 53-238(6).[fn2]

{16}    Plaintiffs also point to federal law to support their claim that defendants' actions violated established public policy and thus constituted unfair and deceptive trade practices. The Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 607, was enacted to protect homebuyers and was intended to eliminate "kickbacks or referral fees" that tend to increase the cost of settlement services. *See Culpepper v. Inland Mortgage Corp.*, 132 F.3d 692, 695 (11th Cir. 1998). Furthermore, RESPA and the regulations promulgated thereunder provide that "any charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates RESPA," 24 C.F.R. § 3500.14(c). Plaintiffs argue that the alleged double charging reflected in defendants' lump sum origination fee in addition to the itemized charges represent "duplicative fees" or "fees for which no or nominal service is provided," in violation of RESPA. In addition, plaintiffs argue that HomeGold's payment of a yield spread premium (a payment to compensate Dylan for the referral of loans bearing above par interest) was illegal under RESPA. This Court declines to rule that the existence of a yield spread premium is per se illegal. *See Culpepper v. Inland Mortgage Corp.*, 144 F.3d 717, 718 (11th Cir. 1998). However, if plaintiffs are able to establish a violation of RESPA, they will be able to support an argument that the acts alleged are per se violations of Chapter 75.

{17}    Furthermore, although defendants argue that the fees charged were legal, even a determination that the fees charged were not usurious does not require the Court to find that the fees were not deceptive or unfair under the circumstances. Plaintiffs allege that the borrowers were assessed the itemized fees set out above, which more than compensated Dylan and/or the lender for originating the loan. Plaintiffs further allege that defendants then imposed an additional charge which they labeled "origination fee," and that in charging this fee, defendants misrepresented to the borrowers that the "origination fee" was a charge for services actually rendered and not otherwise compensated for by the itemized fees. Plaintiffs' allegations that the fees charged in connection with the loans were excessive and that defendants misrepresented the nature of the fees support plaintiffs' claim for unfair trade practices. Defendants vigorously deny the "origination fee" was unearned. That position simply raises a question of fact. If the fees were unearned as alleged, a cause of action has been properly pled.

**B.**

{18}    The sixth claim asserted in plaintiffs' complaint is for breach of a duty of loyalty, and the seventh claim is for a violation of Chapter 75 in connection with such breach.  In support of their motion to dismiss, defendants argue that Dylan did not act as a fiduciary for plaintiffs.  Defendants contend that a fiduciary relationship cannot be found based solely on the fact that Dylan acted as a mortgage broker.

{19}    While no North Carolina case speaks to the fiduciary duty of a mortgage broker, North Carolina courts have recognized the relation of broker and principal as one of the legal relationships that creates a fiduciary duty.  *See Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931).  The function of a mortgage broker is described in *Johnson v. Phoenix Mutual Life Ins. Co.* in the following terms:

> The broker is manifestly engaged in the business of selling his services in procuring a loan which is most favorable to the needs and resources of the potential borrower who, in turn has sought to obtain a broker who can best represent his interests in securing proper financing.

300 N.C. at 261-62, 266 S.E.2d at 620.

{20}    The complaint alleges that plaintiffs sought Dylan to act as a mortgage broker to assist them in obtaining a loan and that Dylan demanded substantial compensation for the skill and expertise it promised to use on plaintiffs' behalf.  Our courts have held that where an individual places trust in the special business skills or judgment of another, a fiduciary relationship is created.  *See Sara Lee Corp. v. Carter*, 129 N.C. App. 464, 470, 500 S.E.2d 732, 736 (1998), *rev'd in part on other issues*, 351 N.C. 27, 519 S.E.2d 308 (1999).  In addition, courts in other jurisdictions that have specifically addressed the issue have held that the mortgage broker's role in advising and assisting borrowers in obtaining a mortgage loan involves a fiduciary relationship.  *See Armstrong v. Republic Realty Mortgage Corp.*, 631 F.3d 1344, 1349 (8th Cir. 1980); *Wyatt v. Union Mortgage Co*., 598 P.2d 45, 50 (Cal. 1979); *Allabastro v. Cummins*, 413 N.E.2d 86, 82 (Ill. App. 1980); *First City Mortgage Co. v. Gillis*, 694 S.W.2d 144, 146 (Tex. App. 1985).  Plaintiffs have pled sufficient facts, which, if true, support the existence of a fiduciary relationship.

{21}    Plaintiffs also have pled sufficient facts to support a claim for breach of that fiduciary duty.  Dylan allegedly held itself out as a mortgage broker and entered into an agreement with the plaintiffs in which it explicitly agreed to represent the borrowers in obtaining a loan.  Given the role Dylan allegedly chose to assume, it is arguable that Dylan's agreement with HomeGold (that it would refer "90% of its monthly flow of loans" to HomeGold in return for the payment of fees to Dylan based on the interest rate charged) was inconsistent with the duty of a mortgage broker.

{22}    Furthermore, there are alleged aspects of the fees charged by Dylan which support plaintiffs' claim for breach of fiduciary duty: (1) Dylan's charging of both specific fees for enumerated services and a general origination fee allegedly resulted in the double-charging of its clients; (2) Dylan allegedly failed to provide adequate disclosure as to the nature of or basis for the origination fee; and (3) the total fees received by Chase were allegedly excessive for the services it provided. Plaintiffs argue that the imposition of these fees breached both Chase's duty to "fully reveal the nature and extent of [its] fees to the client for whom he acts," (quoting *Rushing v. Stephanus*, 393 P.2d 281 (Wash. 1964)), as well as its "duty to deal fairly with the principal in all transactions between them," (quoting *Armstrong*, 631 F.2d at 1349). Plaintiffs' claims for breach of fiduciary duty are not subject to dismissal at this stage.

## C.

{23}    Plaintiffs' fifth claim for relief alleges that the fees charged by defendants were usurious in violation of Chapter 24 of the North Carolina General Statutes. North Carolina law provides that only fees authorized by Chapter 24 may be charged on loans. Specifically, N.C.G.S. § 24-8 states:

> No lender shall charge or receive from any borrower . . . in connection with a loan . . . any sum of money, thing of value or other consideration other than that which is pledged as security . . . together with fees and interest provided for in chapter 24 or chapter 53 of the North Carolina General Statutes . . . .

The loans extended to plaintiffs were each secured by a first deed of trust on a residence and involved less than $300,000 in principal. Therefore, the loans are "home loans" as defined in Chapter 24. *See* N.C.G.S. § 24-1.1A(e) (1991). Fees and interest that can be charged in connection with "home loans" are governed by N.C.G.S. § 24-1.1A, which at the time that the loans in question were closed[fn3] provided:

> (a)    Notwithstanding any other provision of this Chapter, parties to a home loan may contract in writing as follows:
>
> (1)    Where the principal amount is Ten Thousand Dollars ($10,000) or more the parties may contract for the payment of interest as agreed upon by the parties . . . .
>
> (c)    Except as limited by subsection (b) above [regarding prepayment fees], a lender may charge to the borrower the fees described in G.S. 24-10. Provided, if the loan is one described in subsection (a)(1) . . . above, the parties may agree to the payment of discount points, commitment fees, finance charges, or other similar charges agreed upon by the parties notwithstanding the provisions of any state law limiting the amount of discount points, commitment fees, finance charges or other similar charges which may be charged, taken, received or reserved with respect to a home loan . . . .

N.C.G.S. § 24-1.1A.  As referenced in N.C.G.S. § 24-1.1A(c) above, N.C.G.S. § 24-10 allows lenders to charge certain additional fees; however, the statute provides for a limit on such fees.  The statute states:

> (a) No lender on loans made under G.S. 24-1.1 shall charge or receive from any borrower or any agent for a borrower, any fees or discounts unless otherwise allowed where the principal amount is less than $300,000 and is secured by real property, which fees or discounts in the aggregate shall exceed 2% if a construction loan on other than a one or two family dwelling, and 1% of any other type of loan . . . .  Except as provided herein or otherwise allowed, no party shall pay for the benefit of the lender any other fees or discounts.

N.C.G.S. § 24-10 (1991).

{24}    Plaintiffs argue that N.C.G.S. § 24-10(a) applies to home loans under N.C.G.S. § 24-1.1A and limits the amount of fees to 1 percent of the loan amount.  Defendants argue that section 24-10(a) does not apply to home loans but instead expressly applies only to loans made under N.C.G.S. § 24-1.1.

{25}    It is well established that "where the language of a statute is clear and unambiguous judicial construction is not necessary.  Its plain and definite meaning controls." *Colonial Pipeline Co. v. Clayton*, 275 N.C. 215, 226, 166 S.E.2d 671, 679 (1969). The words of a clear and unambiguous statute are given their "plain and ordinary meaning." *Brown v. Flowe*, 349 N.C. 520, 522, 507 S.E.2d 894, 896 (1998).  The plain language of N.C.G.S. § 24-1.1A(c) expressly makes N.C.G.S. § 24-10 applicable to loans made under section 24-1.1A.  The first sentence of section 24-1.1A(c) provides: "Except as limited by subsection (b) above [regarding prepayment penalties], a lender may charge to a borrower the fees described in G.S. 24-10."  While, as defendant points out, section 24-10(a) does not refer to section 24-1.1A, such a reference is unnecessary and would be redundant.  Since the fees imposed in connection with plaintiffs' loans were in excess of 1 percent of the amount of the loan, the fees violate Chapter 24 unless the "origination fee," "underwriting fee," "processing fee," "appraisal review fee," "document preparation fee," "tax service fee," and "flood certificate fee, " were "discount points, commitment fees, finance charges or other similar charges." *See* N.C.G.S. § 24-1.1A(c) (1991).

{26}    The central point of disagreement between plaintiffs and defendants with respect to the fees charged is whether such fees may properly be characterized as finance charges under subsection (c). Plaintiffs and defendants disagree as to what definition of "finance charge" should apply in this case. Section 24-1.1A does not define the terms that make up the phrase "discount points, commitment fees, finance charges or other similar charges," and there is no North Carolina case law construing this phrase.

{27}     Defendants point to section 24-1.1C (dealing with manufactured home loans) and section 25A-8 (dealing with retail installment sales contracts), both of which define finance charge to include any charge imposed as an incident to or condition of the extension of credit.  Outside of these two provisions, "finance charge" is not defined in the General Statutes.  Defendants point to two other sources – Black's Law Dictionary and the federal Truth In Lending Act (TILA), 15 U.S.C. § 1601 *et seq.* – to support their position that the term "finance charge" should be construed broadly.  Black's Law Dictionary 630 (6th ed. 1990) defines finance charge as

> [t]he consideration for privilege of deferring payments of purchase price . . . .  The charges incident to or condition of credit.  Such costs are regulated by state and federal "truth–in-lending" statutes which require full disclosure of finance charges on credit agreements, billing statements and the like.

TILA, which governs the description and disclosure of charges imposed in connection with the extension of credit to consumers, defines "finance charge" to mean

> [t]he sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit  . . . [including] . . . (3) Loan fee, finder's fee, or similar charge . . . (6) Borrower-paid mortgage broker fees . . . .

15 U.S.C. § 1605.  Thus, defendants argue "finance charge" as used in section 24-1.1A(c) refers to "all charges imposed by a lender as an incident to or condition of the extension of credit."  (EquiCredit Mem. Sup. Motion to Dismiss, at 7.)

{28}     Plaintiffs argue that defendants' definition of "finance charge" is contrary to the intent of N.C.G.S. § 24-1.1A(c).  According to plaintiffs, if defendants' expansive definition were adopted, the listing of other specified charges and the reference to "similar" charges would be contradictory and redundant.  Instead, plaintiffs argue that the term "finance charge" as used in N.C.G.S. § 24-1.1A(c) means "a period charge for credit akin to interest."  (Pl. Resp. at 20.)     Plaintiffs base this definition on the context of N.C.G.S. § 24-1.1A(c).  Specifically, plaintiffs argue that the terms "discount points" and "commitment fees" are both ways of compensating a lender for tying up money, and thus are both like interest.  Therefore, according to plaintiffs, "finance charges" should be given a similar construction.  Second, plaintiffs argue, N.C.G.S. § 24-1.1A(c) was written in the context of an existing statutory scheme: section 24-10(a) prohibited "*any* fees" in excess of the 1 percent, "unless otherwise allowed"; section 24-1.1A(c) was enacted as an exception to this broad language, and therefore should be construed narrowly.

{29}     The Court declines to accept either definition of "finance charge" at this stage in the proceedings.  The Court would benefit from discovery on the nature of the fees charged in this case.  Discovery

would help to determine exactly what each fee was for and may shed light on what definition of "finance charge" should apply. Accordingly, where the parties are not in agreement on the definition of "finance charge" and where discovery is necessary to determine the nature of each fee charged, this Court must allow plaintiffs' claims based on excessive fees under Chapter 24 to survive the motion to dismiss.

{30} The interest rates charged to plaintiffs were not usurious. The charging of interest rates in excess of the market rate may not give rise to a claim under Chapter 75. However, if Dylan fraudulently induced the plaintiffs to believe that the interest rates were the best they could get because Dylan was profiting from its agreement with HomeGold, a cause of action exists. If HomeGold was aware of Dylan's alleged actions and continued to profit from them, a cause of action exists against HomeGold as well.

**D.**

{31} Plaintiffs' fourth claim for relief alleges that Dylan was "unjustly enriched through its receipt of origination fees and broker fees from the plaintiffs." (Amend. Compl. ¶ 54.) An action for unjust enrichment is "a claim in quasi-contract or a contract implied in law." *Britt v. Britt*, 320 N.C. 573, 577, 359 S.E. 2d 467, 469 (1987). As a result, it may not be brought if there is an express contract between the parties. *See id.*; *Bright v. QSP, Inc.*, 20 F.3d 1300, 1306 (4th Cir. 1994). Instead, the parties are limited to enforcing the contract between them. 320 N.C. at 578, 359 S.E.2d at 470.

{32} The Amended Complaint alleges that the fees at issue, including the origination fee, were paid in connection with the closing of each of the plaintiffs' loans. (Amend. Compl. ¶¶ 8, 11.) The Amended Complaint also alleges that there was a written contract between Dylan and each of the plaintiffs. (Amend. Compl. ¶ 14.) The disputed fees are the subject of an express contract, and there is no allegation that any contract was breached. As a result, the plaintiffs cannot recover on a theory of unjust enrichment as a matter of law.

{33} "Where, as here, there is a contract which forms the basis for a claim, 'the contract governs the claim and the law will not imply a contract.'" *Hinson v. United Fin. Serv.*¸123 N.C. App. 469, 473, 473 S.E.2d 382, 385 (1996) (quoting *Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E. 554, 556 (1988)). If there is a contract between a plaintiff and a defendant, the plaintiff's rights are determined by the contract. If the contract gives rise to a claim, the remedy also arises from the contract. Unjust enrichment claims may be asserted only where there is no written contract. The unjust enrichment claim should be dismissed.

**E.**

{34}     As stated above, the claims in this case arise from loan transactions entered into between Dylan and plaintiffs. Plaintiffs have asserted claims against Dylan; however, Dylan has filed a petition for bankruptcy. Plaintiffs have also asserted claims against HomeGold, Associates and EquiCredit on the basis of joint and several liability. These defendants find themselves having to defend Dylan. With respect to HomeGold, plaintiffs provide three grounds for joint and several liability: (1) civil conspiracy between Dylan and HomeGold, (2) partnership liability and (3) liability under TILA, 15 U.S.C. § 1641(d)(1). With respect to Associates and EquiCredit, plaintiffs claim that joint and several liability arises because (1) neither Associates nor EquiCredit is a holder in due course and (2) both Associates and EquiCredit are liable under TILA.

{35}     Plaintiffs have sufficiently pled a claim based upon civil conspiracy against HomeGold, and the Court has deferred determination of the partnership issue until after discovery is complete. Associates and EquiCredit stand in a different position. There are no allegations to tie them directly to Dylan. However, the Amended Complaint also sufficiently alleges that Associates and EquiCredit are not holders in due course. At this stage, it is premature for the Court to decide whether Associates and/or EquiCredit are in fact holders in due course. Alternatively, plaintiffs allege that assignee liability is based upon an interpretation of TILA. Defendants argue that TILA is inapplicable to the facts of this case.

{36}   HomeGold asserts the same defense to the TILA claims asserted by Associates and EquiCredit. All three defendants argue that assignee liability under TILA does not apply unless the basis for liability is apparent from the face of the loan documents. Their argument is unsupported by the legislative history and the language of the statute. Specifically, 15 U.S.C. § 1641(a) states:

> *Except as otherwise specifically provided in this title*, any civil action for a violation of this title . . . which may be brought against a creditor may be maintained against any assignee of such creditor only if the violation for which such action or proceeding is brought is *apparent on the face of the disclosure statement.*

(citations omitted)(emphasis added). However, 15 U.S.C. § 1641(d)(1) provides:

> Any person who purchases or is otherwise assigned a mortgage referred to in [§ 1602(aa) of this title] shall be subject to all claims and defenses with respect to that mortgage that the consumer could assert against the creditor of the mortgage, unless the purchaser or assignee demonstrates . . . that a reasonable person exercising ordinary due diligence could not determine, based on the documentation required by this title . . . that the mortgage was a [1602(aa) mortgage].

{37}     Thus, according to the plain language of § 1641(a), "except where otherwise provided," an assignee is subject to civil liability only when the violation is apparent from the face of the closing

documents. Section 1641(d)(1) creates such an exception to § 1641(a) by providing that an assignee of high cost loans under § 1602(aa) assumes the risk of all claims "with respect to that mortgage" as long as it is apparent from the face of the documents that the mortgage was a high cost loan.

{38}    Defendants' argument confuses general TILA assignee liability under § 1641(a) with Home Ownership Equity Protection Act, Pub. L. 103-325, 108 Stat. 2195, ("HOEPA") liability under § 1641(d). Section 1641(a) provides for assignee liability in connection with "any civil action for a violation of this subchapter" (i.e., the entire Truth In Lending Act). In contrast, § 1641(d) provides greater liability for assignees of "HOEPA" mortgages – mortgages that fall within the definition of § 1602(aa). Section 1641(d)(1) provides a broad basis for liability by stating that an assignee of a § 1602(aa) mortgage will be subject to all claims "with respect to that mortgage." Certainly, a claim based on the nature of an aspect of the commercial relationship upon which the mortgage arises is a claim "with respect to that mortgage." In addition, the Senate report makes clear that fees and compensation of mortgage brokers were a focus of HOEPA: "The bill also covers other charges that have been used to exploit unwitting consumers but are not part of the finance charge under Truth in Lending. The bill includes in its definition of points and fees . . . any compensation paid to mortgage brokers." Senate Report No. 103-169, at 24 (1994), *reprinted in* U.S.C.C.A.N. 1881, 1908 [hereinafter *Senate Report*]. Thus, claims based on fees paid by borrowers in connection with the closing of a mortgage are claims "with respect to that mortgage."

{39}    Defendants' argument is also contrary to the intent of Congress in enacting HOEPA. The Conference Committee report on the enacting legislation states: "The bill eliminates 'holder-in-due-course' protections for assignees of High Cost Mortgages. Assignees of High Cost Mortgages are subject to all claims and defenses, whether under Truth in Lending or other law, that could be raised against the original lender." *Senate Report* at 28. The purpose of § 1641(d)(1) is to prevent fraud by encouraging self-policing. An assignee does not have to be able to determine whether there is a violation from the papers, but instead must be able to tell from the papers whether the loan is a high cost mortgage under § 1602(aa). If the loan is a § 1602(aa) loan, the assignee has the responsibility of policing the loan and assumes the risk of liability when he assumes the loan.[fn4]

{40}    Defendants look to *Murray v. The First Nat'l Bank of Chicago*, 239 B.R. 728 (E.D. Pa. 1999) as support for their argument that § 1641(d)(1) does not provide for assignee liability for claims sounding in tort. The *Murray* court rejected a claim against an assignee for alleged violation of the Equal Credit Opportunity Act. Defendants quote the following language from *Murray*:

It is unclear to us whether any ECOA claims could arise here "with respect to [the]

mortgage." Rather, they appear to us to arise from the distinct decision of Coastal regarding the extent of credit to be offered to the Murrays. There is no allegation that the Defendant "participated" in Coastal's decision to offer credit to the Murrays, as is normally necessary to trigger ECOA assignee liability.

239 B.R. at 735-36 (citations omitted). This Court does not find *Murray* persuasive on the issue of whether the claims in this case are claims "with respect to [the] mortgage." Before reaching the § 1641(d)(1) issue, the *Murray* court awarded damages under § 1640 and § 1641(d)(2)(A) which, by effect of the damages cap provided for in § 1641(d)(2), "eliminate[d] all further claims of the Debtor under state and federal law against the Defendant arising out of this transaction." *Id*. at 735. Therefore, the issue of where to draw the line under § 1641(d)(1) was never reached by the *Murray* court.

{41}    HOEPA's statutory scheme is a demanding one. It requires the marketplace to police the actions of brokers and lenders and requires purchasers of mortgages to assume the liabilities (within certain caps) of those from whom they purchase high cost loans. It is designed to protect consumers of high cost loans. It would not provide that protection if it were interpreted to limit assignee liability to only those violations which appeared on the face of the document.

**Conclusion**

{42}    Plaintiffs base this action on the operation of the Agreement between Dylan and HomeGold. Because there is a contract which provides the basis for plaintiffs' claims, their cause of action for unjust enrichment is improper and should be dismissed. However, plaintiffs' Complaint alleges sufficient facts upon which to base their claims for unfair trade practices, usury, and breach of duty of loyalty. Plaintiffs allege that Dylan and HomeGold entered into a agreement, the operation of which was illegal. Defendants argue that because the Agreement required the parties to act in compliance with the law, plaintiffs may not properly base their claims on the Agreement. The Court finds that the Agreement between Dylan and HomeGold does not operate to bar plaintiffs' claims. This Court also finds as a matter of law that Dylan, as a mortgage broker, owed a fiduciary duty to its borrowers. Accordingly, plaintiffs' claims for breach of fiduciary duty may be properly based on the operation of the Agreement.

{43}    Plaintiffs' claim for usury is based on the allegation that Dylan charged fees that were excessive under Chapter 24 of the North Carolina General Statutes. The Court finds that N.C.G.S. § 24-10(a) applies to home loans and, subject to express exceptions, effectively limits the amount of permissible fees to 1 percent of the loan amount. Such an exception is created by N.C.G.S. § 24-1.1A(c) which

provides that the lender and borrower may negotiate the amount of "discount points, commitment fees, finance charges or other similar charges."  The Court reserves for a later date the determination of whether the fees charged to plaintiffs in this case fall within the exception created by N.C.G.S. § 24-1.1A(c).  However, for the purposes of this motion, plaintiffs have sufficiently stated a claim under Chapter 24.

{44}    The Court also finds that plaintiffs have pled sufficient grounds for asserting assignee liability against Associates and EquiCredit.  While the Court reserves judgment on the question of whether Associates and EquiCredit are holders in due course, the Court finds that, as assignees, they are subject to liability under § 1641(d) of the federal Truth In Lending Act.  Therefore, plaintiffs' claims against Associates and EquiCredit survive these defendants' motion to dismiss.

{45}    Therefore, it is hereby ordered adjudged and decreed:

1.    Plaintiffs' claim for unjust enrichment is dismissed.

2.    With respect to all other claims asserted by plaintiffs, defendants' motions to dismiss are denied.



This the 12th day of June, 2000.


Footnote 1    Though plaintiffs refer to and describe the terms of the Agreement in the Amended Complaint, they did not attach a copy to the Amended Complaint.  However, if a document is expressly referenced in a complaint, the Court can consider the document without converting a motion to dismiss into a motion for summary judgment.  *See Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994) ("[D]ocuments whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss."); *Beddall v. State St. Bank & Trust Co*., 137 F.3d 12, 16-17, (1st Cir. 1998); *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384-85 (10th Cir. 1997).

Footnote 2    Plaintiffs argue that while Dylan is directly liable for this statutory violation, HomeGold is liable under a theory of partnership liability.  Whether a partnership existed between Dylan and HomeGold involves questions of fact that are not properly at issue on a motion to dismiss.  The existence of the written agreement between the parties does not necessarily preclude a finding of a partnership which would support liability.  Those issues are more appropriately addressed at the summary judgment stage of the proceedings.  In addition, at this stage in the proceedings, the Court declines to decide whether Chapter 53 is applicable to HomeGold.

Footnote 3    Chapter 24 was revised extensively effective October 1, 1999. The loans at issue in this action were entered into prior to that date and the previous version of Chapter 24 applies in this case.

Footnote 4    Assignee liability under TILA is not without limitation.  The statute sets a cap on damages recoverable from an assignee.  *See* 15 U.S.C. § 1641(d)(2).